[Cite as *Shephard v. CrossCountry Mtge., Inc.*, 2025-Ohio-1929.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

CHERYL SHEPHARD,                    :

    Plaintiff-Appellee,         :

                                  No. 114149
    v.                          :

CROSSCOUNTRY MORTGAGE, INC.,
ET AL.,                             :

    Defendants-Appellant.       :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** May 29, 2025

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Case No. CV-22-970425

---

### *Appearances:*

Flowers and Grube, Paul W. Flowers, and Kendra N. Davitt; Haber Legal Group, Richard C. Haber, Lindsey K. Self, and Natalie D. Davis, *for appellee.*

Ogletree, Deakins, Nash, Smoak & Stewart, P.C., Robert C. Petrulis, and Amanda T. Quan, *for appellant.*

EILEEN A. GALLAGHER, A.J.:

{¶ 1} Appellant-employer CrossCountry Mortgage, LLC ("CCM") appeals the denial of various motions and evidentiary rulings by the trial court throughout, and following, a jury trial. [1] Having reviewed the record and the applicable law, we affirm.

## I.      Facts and Procedural History

{¶ 2} On October 25, 2022, appellee Cheryl Shephard ("Shephard") filed her complaint against CCM and Vice President of Finance Mark O. Novak ("Novak") at CCM, alleging she had been discriminated against and terminated by CCM because of her age and disability in violation of R.C. 4112.02. Shephard's request for relief sought both compensatory and punitive damages.

{¶ 3} On January 17, 2023, CCM and Novak filed a joint answer denying the allegations. The parties then engaged in discovery and conducted several depositions. Over 8,000 documents were produced in discovery by CCM.

{¶ 4} On September 18, 2023, CCM and Novak filed a motion for summary judgment on all claims. On December 20, 2023, the trial court denied the motion, finding that, after considering all of the evidence and construing the evidence in a light most favorable to Shephard, there remained genuine issues of material fact and that CCM and Novak were not entitled to judgment as a matter of law.

---

[1] Although CCM is listed in the case caption as CROSSCOUNTRY MORTGAGE, INC., CCM refers to itself as CrossCountry Mortgage, LLC.

{¶ 5} Before trial, the trial court granted the defendants' motion to bifurcate the compensatory-damages and punitive-damages claims for trial purposes.

{¶ 6} On January 22, 2024, the case proceeded to a jury trial.

{¶ 7} The trial court denied the defendants' motion for directed verdicts. Shephard also moved for a directed verdict as to her age- and disability-discrimination claims and requested a directed verdict as to CCM's affirmative-defense claim that Shephard failed to mitigate her damages. The trial court denied the motion as to Shephard's age- and disability-discrimination claims but granted the motion as to CCM's failure-to-mitigate defense.

{¶ 8} On January 31, 2024, the jury returned a verdict in favor of Shephard and against CCM for Shephard's age-discrimination claim and awarded Shephard $544,997 in compensatory damages for back pay, front pay, pain and suffering and mental anguish. The jury found that CCM did not discriminate against Shephard regarding her disability. The jury also returned a verdict in favor of Novak as to Shephard's claims against him.

{¶ 9} The case proceeded to the punitive-damages phase and the jury returned a verdict in favor of Shephard against CCM and awarded Shephard $1,250,000 in punitive damages. The jury also determined that CCM was liable for Shephard's attorneys' fees.

{¶ 10} On February 15, 2024, Shephard filed a motion to amend the judgment to include prejudgment and post-judgment interest, which was unopposed and granted. Shephard also filed a motion to amend the judgment and

award her reasonable attorney's fees in the amount of $359,845 and litigation expenses in the amount of $25,251.04.

{¶ 11} On February 29, 2024, CCM filed a motion for judgment notwithstanding the verdict or, in the alternative, a motion for a new trial. CCM also moved the court to reduce damages and enforce the punitive-damages cap pursuant to R.C. 2315.21(D)(2)(a).

{¶ 12} On March 15, 2024, Shephard filed an *amended* motion to amend the judgment and award reasonable attorney's fees and litigation expenses. Shephard moved the court to award reasonable attorney's fees in an amount between $657,477.55 to $715,490.28, based on a lodestar enhancement of 1.7 to 1.85 of the base amount of $386,751.50. Shephard also requested the trial court award litigation expenses in the amount of $29,519.67.

{¶ 13} On April 22, 2024, CCM filed an amended motion for judgment notwithstanding the verdict or, in the alternative, a motion for a new trial or to amend the judgment to reduce damages and enforce the punitive-damages cap.

{¶ 14} CCM filed a brief in opposition to Shephard's motion to amend the judgment and award reasonable attorney's fees. In said brief, CCM stipulated that

> (1) [Shephard's] lodestar calculation of attorney's fees (i.e. $386,751.50) constitutes reasonable attorney's fees for this case; (2) that $29,519.67 constitutes reasonable litigation expenses for this case; and (3) that $21,899.39 is the appropriate pre-judgment interest.

As such, CCM did not oppose the award of attorney's fees and litigation expenses but did oppose the request for an enhancement of the lodestar calculation.

{¶ 15} The trial court granted Shephard's unopposed motion to amend judgment to include prejudgment and post-judgment interest. At a hearing held on the issue of attorney's fees and litigation expenses, Shephard's counsel testified as to the fee amount and litigation expenses. Expert witness attorney Thomas Feher also testified at the hearing regarding the reasonableness of Shephard's attorney's fees and why a 1.7 to 1.85 enhancement of the lodestar amount was reasonable.

{¶ 16} Shephard filed a supplement to her motion for attorney's fees and litigation expenses based on the hearing. In her motion, Shephard asserted that her reasonable attorney's fees lodestar calculation was $419,052 and that her litigation expenses were $41,538.21.

{¶ 17} The trial court issued a final judgment entry where it granted, in part, Shephard's motion to amend the judgment and award reasonable attorney's fees and litigation expenses but denied the request for an enhancement of the lodestar calculation. The trial court found the lodestar calculation of attorney's fees and litigation expenses in Shephard's case was reasonable. The trial court also denied CCM's amended motion for judgment notwithstanding the verdict, or in the alternative, motion for a new trial. The trial court granted CCM's motion to enforce the punitive-damages cap, to which Shephard stipulated. The court rendered a final judgment in favor of Shephard against CCM in the amount of $2,126,059.39 which consisted of $544,997 in compensatory damages, $1,089,994 in punitive damages, $419,052 in attorney's fees, $41,538.21 in litigation expenses and $30,478.18 in prejudgment interest.

{¶ 18} The court then granted CCM's unopposed motion to stay enforcement of the judgment pending this appeal after CCM posted a $2,494,576.35 surety bond.

{¶ 19} CCM raises the following six assignments of error for our review:

1. The trial court committed reversible error when: (1) contrary to its own jury instructions, it improperly permitted questioning and testimony that a legal objection to a discovery request constitutes a binding party admission, (2) it denied CCM's subsequent request to ask similar questions of Ms. Shephard, and (3) it denied CCM's motion for a new trial/JNOV motion on the matter.

2. The trial court committed reversible error when it improperly: (1) permitted the introduction of a severance agreement (that Ms. Shephard did not sign) into evidence, (2) permitted questioning regarding the implications of language contained in the severance agreement and the requirements of the older workers benefit protections act, (3) denied CCM's subsequent request to ask similar questions of Ms. Shephard, (4) denied CCM's subsequent request that the trial court provide a curative instruction, and (5) denied CCM's motion for a new trial/ JNOV motion on the matter.

3. The trial court committed reversible error when it denied CCM's motion for a directed verdict at trial, and its post-trial JNOV motion relative to Ms. Shephard's age discrimination claim against CCM.

4. The trial court committed reversible error when it denied CCM's motion for a directed verdict at trial and its post-trial JNOV motion relative to the jury's punitive damages award.

5. The trial court committed reversible error in connection with evidentiary rulings at trial related to alleged damages and Ms. Shephard's retirement plans, which denied CCM a fair trial, and when it denied CCM's motion for a new trial in connection with the trial court's redaction of trial exhibit EEEE.

6. The trial court committed reversible error when it denied CCM's motion for a new trial due to material irregularities in the trial court proceedings evidencing significant jury confusion, which resulted in an unfair trial for CCM.

{¶ 20} For the sake of judicial economy, the assignments of error will be addressed in combination and out of order.

## II.    Trial Testimony and Proceedings

{¶ 21} The following testimony was elicited at trial.[2]

### a.  Cheryl Shephard

{¶ 22} CCM hired Shephard as a senior accountant on August 22, 2016.  She was 57 years old when she began working for CCM.  Shephard testified that at the time of trial she was 66 years old.  Shephard holds a bachelor's degree from Baldwin-Wallace College and has been a certified public accountant ("CPA") since 1982, renewing her license every three years.

{¶ 23} CCM is a mortgage company that generates its main profit from creating and selling loans.  Shephard was hired into the role of senior accountant with a starting salary of $62,000.  At the time of her termination from CCM her salary was $69,657.  Shephard was terminated by CCM on June 20, 2022 at the age of 65 years.  When terminated, she was told by CCM that her job was eliminated, but she believed she was terminated because of her age.  She was terminated by Michelle Novak ("Michelle"), head of Human Resources ("HR"), via a phone call.  Michelle told her there was a new business model and her job was being eliminated.

{¶ 24} Shephard testified that Novak was hired in October 2021 as executive vice president of finance.  At that time, Shephard reported to David Constantini

---

[2] This opinion will only focus on trial testimony concerning Shephard's age-discrimination claim since the jury did not find disability discrimination and it is not related to any matter being appealed.

("Constantini") who reported to Novak, who reported to Madhur Agarwal ("Agarwal") the chief financial officer ("CFO"). Constantini was hired in June 2018 and was Shephard's manager and supervisor until he left CCM on February 28, 2022.

{¶ 25} The first time she spoke with Novak was in the fall of 2021 when he was hired. He called Shephard "out of the blue" and began "drilling [her]" on her job duties and, thereafter, they had several conversations about her job duties. She believed he was questioning everything she did, and it made her feel like she had to defend herself and her choices. Shephard felt disrespected.

### Shephard's Job Duties

{¶ 26} At CCM, Shephard was responsible for three main areas: accruals, fixed assets and prepaids. Accruals are expenses that have not been paid yet, while prepaids are paid in full before service is provided. Regarding fixed assets, it was Shephard's job to devise a system to keep track of CCM's fixed assets. She worked with accounts payable to keep track of everything on which CCM expended money to determine whether, or not, it was a fixed asset. Shephard was never disciplined for how she tracked fixed assets. Shephard was instructed by John Krantz ("Krantz"), a prior CFO, to leave a fixed asset on the books even if she was unaware of its location. Six years after a branch closed, any fixed assets on the books from it would be written off. Shephard was instructed by Krantz that old fixed assets are a low priority for her work.

{¶ 27} Regarding prepaids, Shephard managed prepaids according to Generally Accepted Accounting Principles ("GAAP") and how management had instructed her to account for them. When CCM employee Dana Del Sonno ("Del Sonno") became her supervisor, she told Shephard to process prepays a different way and Shephard complied. Shephard believed the way she had booked prepaids was compliant with GAAP and was approved by her supervisor, Constantini. Her supervisor before Constantini also approved the way Shephard booked prepaids. Shephard never received any disciplinary or corrective action for how she booked prepaids.

{¶ 28} Shephard testified that her accounting group was responsible for creating the financial statements of CCM. Financial statements provide information about a company's ability, or lack thereof, to generate profit by increasing revenue and reducing costs. Financial statements are used by CCM to make business decisions. It is important that they are accurate so CCM can rely on them to make financial decisions for the company. CCM publishes monthly, quarterly and annual financial statements, which are reviewed by CCM's owner and Chief Executive Officer ("CEO") Ron Leonhardt ("Leonhardt").

{¶ 29} CCM wanted the books closed and the financial statements prepared for each month within seven to ten business days after the last day of each month. Shephard would never take vacation days during the beginning of the month because of this. In April 2022 Shephard was sick and Del Sonno had to help Shephard by doing the accruals and prepaids for her that month.

**Evaluations**

{¶ 30} Constantini's title was controller, and he was Shephard's supervisor for most of her time as CCM. When he left, Del Sonno became her supervisor. Constantini never criticized Shephard's work performance. During her time at CCM, Shephard received three oral performance evaluations from the prior controller Tracey Hamilton and one written evaluation from Constantini on June 21, 2021 and it was positive. The evaluation rated Shephard's performance on a one-four scale. Four meant she exceeded expectations, three was met expectations, two was below expectations and one was unsatisfactory. Shephard did not receive any one or two scores. Her evaluation consisted of scores of threes and fours in areas such as communication, teamwork, job knowledge, productivity, quality, judgment, initiative, innovative and accountability of mindset. In her review from Constantini she received seven threes for meets expectations and two fours for exceeds expectations.

{¶ 31} Shephard never received a performance evaluation from Novak or Del Sonno and neither of them ever criticized her work performance or issued any sort of corrective actions against her. Shephard was never placed on a performance-improvement plan and received a raise after her written performance evaluation by Constantini in June 2021. Shephard testified that she was proud of her performance with CCM.

**$938,867.19 Error in Accruals**

{¶ 32} Shephard testified regarding an error that she made in December 2021 where she copied the wrong number in a spreadsheet which resulted in a misstated amount of $938,867.19.  The mistake was made when Shephard copied an amount from the wrong column on a spreadsheet, and she realized her mistake the next day.  Once she realized the error, she informed her supervisor, Constantini, who told her the mistake was immaterial because it was reversing out the next month so not to worry about it because it would correct itself.  Shephard was never disciplined for the error.  Constantini also told her the mistake was immaterial due to the percentage that that amount was to CCM's total expense and balance sheet.  Constantini informed Shephard that the financial statements had already been given to CCM's owner.

{¶ 33} A few weeks later, Del Sonno raised the issue and Shephard explained she made the mistake and had brought it to Constantini's attention.  Shephard was not placed on a performance improvement plan related to this error and was not disciplined for it.

**Error Regarding Missing Loan Receivable Schedule**

{¶ 34} Shephard also testified regarding an error she made that was pointed out by Del Sonno on March 15, 2022.  Del Sonno had recently been appointed controller and was Shephard's new supervisor.  The mistake involved a missing loan receivable schedule that caused an errant difference in the amount of $300,157.41.

When asked about the difference by Del Sonno via email Shephard responded to her:

> Dana, I have absolutely no excuse for my mistake on the summary. At the last minute, I changed the format of Richard Fidelli's schedule and didn't adjust the cell that was being pulled into the summary. And obviously, I didn't double check the summary before I sent it to you. All I can say is I learned a valuable lesson and will do my very best to not make such an avoidable error in the future.

Shephard testified that Del Sonno kept finding things she did that were "wrong" but explained that Del Sonno had a particular way in which she preferred the financial information to be presented. Nothing was wrong with Shephard's work product other than how it was being presented.

### Adam Scher and Termination

{¶ 35} Adam Scher ("Scher") was hired on April 1, 2022, as accounting manager.  At the request of Novak, Shephard trained Scher on how to manage the fixed assets.  In April 2022, Shephard stopped working with fixed assets because she was told by Novak that the job responsibility was being given to Scher.  Shephard was told Scher would be reviewing her work.

{¶ 36} By May 5, 2022, CCM had relieved her of three main job responsibilities:  fixed assets, accruals and prepaids at the instruction of Novak and Del Sonno.  By May 19, 2022, all of her work, including her three main responsibilities, had been reassigned to Scher and she was initially told that the reassignment was for training purposes.  In late May 2022, she was assigned to

process expense reports, for which she was overqualified, since this job is typically given to an entry-level accounts payable clerk.

{¶ 37} Shephard was terminated from CCM by Michelle on June 20, 2022. Shephard was told that there was a new business model and her job was eliminated. Shephard was 65 years old when she was terminated. Shephard was never told she was being included in a mass layoff or reduction in force. She believed Novak eliminated her because she was old. She asked if other people were being let go and she was told no, not in the accounting department.

### Post CCM

{¶ 38} At 66 years old, Shephard has been applying for jobs since she was terminated from CCM but has been unable to secure employment. She has been applying for comparable roles of senior account or accounting manager, assistant controller and accountant. Shephard related that her termination from CCM has caused her to suffer emotionally.

### Exhibit EEEE

{¶ 39} Shephard testified regarding Exhibit EEEE, a text message from Shephard to her daughter and son-in-law sent during litigation that said:

> Had a call with the attorneys today. CCM is asking for a number that we could live with to not go to trial. Attorneys are saying $400,000. That would make up for 5 years of earnings (had planned to work for another 2 years, but as they said — I might have had to work longer).

> Trial would be so much more. This is crazy. Then I started to dream of that indoor pool addition.

Prior to trial this exhibit was subject to a motion in limine where the parties disputed what if any parts should be redacted. The trial court ruled and redacted the "$400,000" and the "5 years of earnings" from the exhibit.

{¶ 40} Shephard was cross-examined regarding another message to her daughter on June 20, 2022 in which she told her daughter she thought her termination was coming because she felt very unsafe. Shephard testified that she told her daughter if it did not happen she would retire and that this was a lie. Shephard lied to her daughter because her daughter has bipolar disorder and she did not want her daughter to worry because Shephard provides financially for her daughter. Shephard wanted to work until she was "70ish."

## b. Michelle Novak – CCM's Corporate Representative

{¶ 41} Michelle testified as a Civ.R. 30(B) corporate representative witness for CCM.

{¶ 42} According to Michelle, CCM's position at trial was that Shephard was terminated on June 20, 2022, in connection with a reduction in force for cost savings because volume and production of loans were down. Interest rates were raised before the reduction in force and this was one of the main factors driving this alleged reduction in force.

### CCM's Discovery Responses and Answer

{¶ 43} Michelle testified regarding CCM's responses to Shephard's discovery requests. CCM's responses were verified as true under oath by Michelle. In her fourth interrogatory, Shephard asked CCM to "identify any and all individuals hired

in the accounting department between February 2022 to June 2022," and to include their name, disability status, date of birth, dates of employment, current job title and annual compensation in 2022.

{¶ 44} CCM provided the following response: Manbir Sidhu ("Sidhu") was hired as assistant controller in February 2022, at 33 years old with a salary of $140,000; Scher was hired on April 1, 2022, as accounting manager at 29 years old with a salary of $85,000. Brian Arnold was hired on April 5, 2022, as an investment analyst and was 28 years old with a salary of $125,000. Richard Huszai ("Huszai") was hired on April 20, 2022, as assistant controller and he was 32 years old with a starting salary of $105,000. Last, Michael Begany was hired on June 13, 2022, at 42 years old as senior director of finance with a salary of $170,000.

{¶ 45} All hires except for Sidhu were after the interest rates were raised. These positions added $485,000 in annual salaries to the accounting department and, of this amount, $345,000 was added after interest rates increased.

{¶ 46} Despite these additions to the accounting department, Michelle reiterated that Shephard, who was on track to make $69,657 that year, was terminated in a reduction in force on June 20, 2022 and the sole reason Shephard was chosen for termination in the reduction in force was due to her low performance even though CCM's answer to Shephard's complaint stated Shephard was terminated because her position was eliminated. Michelle maintained that Shephard's position was eliminated in the reduction of force. At trial Michelle

explained that, in the reduction of force, Shephard's position was not replaced so they told her she was laid off.

**{¶ 47}** Michelle testified that the reason provided in CCM's answer for Shephard's job elimination was false. She also testified that CCM's discovery response stating Shephard's position was eliminated was also false.

**{¶ 48}** Michelle stated that Shephard was selected for termination based on her performance, not that her position was eliminated. Michelle agreed that documents related to Shephard's performance are relevant to her claim and for the jury to consider.

**{¶ 49}** Shephard requested in her request for production of documents that CCM produce all of Shephard's performance reviews and/or documents reflecting Shephard's performance. CCM's response to that request was an objection that stated in part: "seeks documents that are not relevant to the claims and defenses of this action." Michelle clarified that "the claims" were Shephard's age- and disability-discrimination claims. Michelle admitted, based on CCM's responses to discovery, that in February 2023, when the discovery responses were provided, documents related to Shephard's performance were irrelevant to Shephard's claims. CCM's counsel objected to these questions, arguing CCM's response was a legal objection to a discovery request and not a binding admission. The trial court overruled the objection.

**{¶ 50}** Michelle testified that in early May 2022, prior to Shephard's termination, Michelle was approached by Shephard's managers Novak and Del

Sonno who came to HR and informed her that Shephard was having difficulties in her job performance. Michelle requested to review documentation evidencing Shephard's difficulties. On May 3, 2022, Del Sonno sent an email to Michelle with attachments regarding Shephard's performance. In her email there were several attachments including some financial documents demonstrating the $938,867.19 error Shephard admitted she had made. Michelle testified that she did not understand the financial documents and required Del Sonno or Novak to explain them to her so she could understand Shephard's performance issues. She needed to understand their issues with Shephard so she could coach them on how to help improve Shephard's performance. No follow-up discussion between Michelle, Novak or Del Sonno ever occurred after the email from Del Sonno was sent.

{¶ 51} Michelle testified that she relied on Vice President of Finance Novak and controller Del Sonno's combined expertise and recommendation regarding Shephard's alleged performance issues. They communicated to her that Shephard had made several errors and her performance was low. Michelle testified that she had hoped to put Shephard on a performance-improvement plan and had informed Del Sonno about this plan. Michelle testified that Shephard was not going to be terminated based on her performance issues. Michelle was going to have a follow-up conversation with Novak and Del Sonno to discuss a performance-improvement plan for Shephard but she never had the opportunity between May 3, 2022 and when Shephard was terminated on June 20, 2022. Michelle testified she was unable

to have this follow-up conversation because she was busy "onboarding" 900 new employees.

{¶ 52} Michelle testified that different criteria were used in deciding who would be laid off during the reduction in force. Department heads were told to look at their staff to see who was exceeding expectations and who was a low performer. Based on these criteria, Shephard was selected for the reduction in force as a low performer. Michelle testified that during this time CCM was experiencing great growth. The 900 new employees were not for the accounting department, but instead were loan officers working in sales originating loans and selling refinancing. Michelle testified that, in 2022, and again in 2023, CCM was recognized by Inc. Magazine as one of the fastest growing companies in the country. These awards were based on revenue. Michelle testified that the number of employees in the accounting department grew in 2022.

{¶ 53} Michelle testified that loans officers comprise the largest group of employees at CCM, with over 2,000 people so employed. CCM purchased a company called Lend U.S. in early 2022 and, in doing so, it acquired 900 new loan officers. The loan officers are commission based. CCM did not merge any of Lend U.S.'s HR or accounting employees, just the loan officers.

{¶ 54} Michelle then testified as to her personal knowledge as an individual employee of CCM. She was the executive vice president of HR at CCM and had been with CCM for over eight years and was the highest ranked HR person at CCM. As vice president of HR, she was ultimately responsible for maintaining employee

personnel files, onboarding documents, payroll and benefits. An employee involved in an HR investigation would have notes in their benefit personnel file. Investigation files are kept separately in the personnel file. As vice president of HR, she is responsible for drafting and implementing policies at CCM which includes CCM's Equal Employment Opportunity ("EEO") policy which she helped prepare with CCM's legal team and outside counsel.

{¶ 55} The EEO policy prohibits discrimination on the basis of age and disability. To enforce this policy Michelle investigated claims of discrimination. The policy is to protect employees and CCM.

{¶ 56} Shephard came to HR in May 2022 requesting an accommodation for a disability. She spoke with Kathryn Walko ("Walko"), Michael Courtney ("Courtney") and Brittany Scherma ("Scherma"), who are employees in HR. Shephard told Scherma that Shephard believed that Novak and Del Sonno were trying to "get rid of her." Part of the reason Shephard believed this was that Constantini had called Shephard and shared with her that CCM was saying things and Shephard felt they wanted her gone. Her biggest concern was being able to continue working from home, and HR addressed that issue.

{¶ 57} Michelle testified regarding notes taken by Scherma during a telephone call with Shephard. The notes document that Shephard "stated that she feels that [Del Sonno] and Novak want her gone." Michelle testified that Shephard only felt that management wanted her gone, but there were no facts or evidence to support that so Michelle did not investigate that feeling.

{¶ 58} Michelle testified regarding HR notes that detailed Shephard's concerns about how Novak was taking away her work responsibilities and that they were being reassigned to other employees. Michelle testified that Shephard only briefly mentioned her work being taken from her and that she did not share any more information with HR at that time.

{¶ 59} Michelle learned about Shephard's accommodation and concerns about her job in a meeting with Walko, who reports to Michelle. Shephard never used the word discrimination to describe her situation when talking to anyone from HR. She never described the discrimination or that she felt any discrimination. Once given an accommodation on June 1, 2022, Shephard did not call HR again. Michelle never spoke to Novak about the way he was treating Shephard or his alleged discrimination against Shephard. Michelle never actually spoke to Shephard about this. The only time they spoke was when Michelle fired Shephard on June 20, 2022.

{¶ 60} Michelle testified about an email sent on June 6, 2022, from CEO Leonhardt regarding the reduction in force. The email was sent to some employees, including the chief of branch officer, chief operating officer, chief legal officer, and all executive leadership teams. Michelle said she did not receive this email. Leonhardt stated in the email that the reduction in force was needed "to control the cycle." Expenses were up with payroll and benefits, and CCM was producing and selling fewer loans.

**{¶ 61}** Michelle testified about an email sent on June 21, 2022, by Agarwal to the executive leadership team consisting of Michelle, Novak and Scott Miller titled "CCMELT." In response to this email, Michelle sent an email on June 22, 2022 to department heads to engage in a "head count planning" to review their departments' headcount and how they can reduce it.

**{¶ 62}** The "head count email" from Michelle provided criteria for department heads to use as a guideline for selection in the reduction in force, such as an employee's tenure, years of experience, skill set, full-time or part-time status, performance, exceeds expectations, does not exceed expectations, performs multiple roles, cross functional, potential for promotion, leadership, contribution and impacted work. Michelle testified that Shephard was terminated before she sent the email on June 22, 2022, that contained the suggested criteria for termination.

### Severance Agreement

**{¶ 63}** A spreadsheet created by Courtney from HR was identified as "[Agarwal's] termination 6/20/22 to 7/21/22," and listed people Agarwal terminated. The spreadsheet contains eight names, which were the people terminated in Agarwal's department. The spreadsheet listed the employee's job title, their department number, if it is voluntary or involuntary and the reason, hire date, termination date, age and gender. Shephard's name is on this spreadsheet. All employees listed except one were over 40 years old and all terminations except one were involuntary with the termination reason as "RIF" i.e., reduction in force.

Kimberly Bonazza ("Bonazza") is the only person listed as terminated because of performance.

{¶ 64} Michelle testified that HR has this spreadsheet of terminated peoples' ages because, depending on their age, CCM used two different types of severance agreements based on age in order to comply with the Older Workers' Benefit Protection Act ("OWBPA"). *See* 29 U.S.C. 621 et seq.

{¶ 65} Shephard was provided a confidential severance agreement when she was terminated. The admittance of that severance agreement at trial was the subject of a motion in limine brought by CCM, who argued that Evid.R. 408 applied by prohibiting the introduction of evidence of an offer to compromise. The trial court denied this motion but did order the monetary amount of the severance payment be redacted. CCM also objected to Michelle's cross-examination by Shephard's counsel regarding this document which the trial court overruled. Lastly, CCM sought to recall Shephard to testify regarding the severance agreement, which the trial court also denied.

{¶ 66} According to Michelle, the severance agreement was prepared by the legal team, not HR. Michelle testified she was not aware of the specific guidelines for what a severance agreement must contain depending on if the employee was terminated in a reduction in force or individually. Michelle testified that she did not know about the different severance agreements required to comply with OWBPA until her deposition. Michelle testified that she now understands that employees terminated as part of a reduction in force require a 45-day review period for a

severance package under the OWBPA. When an employee is terminated individually, the statute requires a 21-day period to review the separation agreement if they are over 40. In Shephard's severance agreement she was given 21 days to review the agreement.

{¶ 67} In compliance with OWBPA, when employees over 40 are terminated in a reduction in force they must be provided with a decisional unit, which contains information of all the employees considered for the reduction in force and those that were not terminated as well as those employees' ages. Michelle testified that in reviewing Shephard's severance agreement it did not contain the required "decisional unit" for a reduction-in-force termination. Michelle agreed that if Shephard was included in a reduction in force her severance agreement did not comply with OWBPA.

{¶ 68} Michelle testified that she was unaware if everyone impacted by the reduction in force received a severance agreement in compliance with OWBPA.

### c. Dana Del Sonno – Controller

{¶ 69} Del Sonno testified that she is 38 years old and is the controller at CCM and was promoted to the controller role in February 2022. Prior to being the controller, she was the assistant controller at CCM and reported to Novak. In her role she supervises about 30 employees and supervised Shephard from February 2022 until Shephard was terminated on June 20, 2022. In her role as controller she was involved with interviewing candidates for positions in accounting. Del Sonno is not a CPA.

{¶ 70} Del Sonno testified that Shephard was responsible for three main areas: prepaids, fixed assets and accruals. Scher was hired in April 2022 as the accounting manager and was brought in to cross-train, learn procedures, streamline areas and help with other projects. He cross-trained with Shephard regarding her job responsibilities. As of the day of trial, Scher was performing Shephard's job duties with prepaids, fixed assets and accruals.

{¶ 71} Del Sonno understood the reduction in force was for cost-saving purposes in 2022. Del Sonno admitted that she received bonus compensation in 2022 amounting to somewhere between $15,000-$20,000. Del Sonno testified that CCM held a large sales rally in Las Vegas in the summer of 2022, which she says cost roughly $1.5-$2 million. In early 2022, CCM hired an accounts payable manager, some accounts payable staff and a senior financial analyst.

{¶ 72} Del Sonno testified that Shephard was terminated in a reduction in force based on her performance and not because there was a lack of work and Shephard was the only one in the accounting department terminated in the reduction in force. There was no quota of people that Del Sonno had to suggest for the reduction in force but Agarwal told her she had to come up with a name.

### Concerns Regarding Shephard's Errors as a Low Performer

{¶ 73} Del Sonno testified that she was concerned about Shephard's performance and her understanding of GAAP, even though she is not a CPA, and also the issue of the $938,867.19 error Shephard made. Del Sonno admitted this error did not cause CCM to lose any money. Rather it caused CCM's financials to be

misstated and was one of the reasons Shephard was selected for termination. Del Sonno never disciplined or spoke to Shephard about this error because it happened before Del Sonno was supervising Shephard.

{¶ 74} Del Sonno was also concerned with the way Shephard handled fixed assets in that she was inappropriately disposing of assets when a branch location closed. That is, Shephard was not taking the assets off the books until they fully depreciated. CCM has over 600 branches across the country. When a branch office closed, an email was sent to Shephard, and she responded by identifying the branch's fixed assets and determining what should be done with them after the closure.

{¶ 75} An email sent on May 13, 2022, by Trisha James, a branch audit compliance manager to Scher, was introduced. The email contained branch office locations that had closed and had fixed asset balances. Scher would have sent Shephard this spreadsheet because he was working on fixed assets with Shephard at this time and was cleaning up fixed assets. This email shows 20-line items of missing fixed assets from 15 different branch locations. The oldest closure date was 2016. The most recent closure date was August 2020. There were no assets incorrectly left on the books by Shephard from August 6, 2020 until she was terminated on June 20, 2022.

{¶ 76} Del Sonno was seriously concerned with how Shephard was handling these missing fixed assets from the 15 closed branches. Del Sonno believed Shephard was lacking in attention to detail that resulted in expenses being posted in

the wrong time period. Del Sonno did not think this reflected that Shephard was unfamiliar with GAAP but rather that she was not disposing of the assets within an appropriate time. Del Sonno never disciplined Shephard for this or even spoke to her about it.

{¶ 77} Del Sonno also had concerns about how Shephard was doing prepaids. Del Sonno believed Shephard was not amortizing expenses over the correct time periods. This concern was based on GAAP's matching principle that says a company should record the expenses in the periods they were incurred. Del Sonno looked at Exhibit S, which showed some prepaids. Prepaid #3 said, "Cleveland Browns," under vendor and the total amount to be paid was $52,151,741, which was for a sponsorship. Del Sonno testified the Cleveland Brown's contract says payment is supposed to be made in April and September of every year from April 1, 2021 to March 31, 2031 but the first payment was made in September 2021. This was not a typical prepaid. Shephard told Del Sonno this contract was amortized the way Constantini told her to do it and he got approval from outside auditor Ernst & Young to do it that way.

{¶ 78} Del Sonno testified about an email from Constantini to Shephard dated January 14, 2022 in which Constantini stated that the total payments for the Cleveland Brown's contract should be divided by 120 months. This amortization was done while Constantini was still controller and Shephard's supervisor. Del Sonno explained to Shephard when she became her supervisor that she wanted prepaids to be amortized differently and Shephard agreed.

{¶ 79} Del Sonno testified that in the six years that Shephard was doing prepaids, there were no significant errors. Del Sonno agreed that accountants make errors.

{¶ 80} An email dated March 15, 2022, from Shephard to Del Sonno and Novak referenced loan receivables, which occur when CCM lends an employee money that is either repaid or forgiven. Payments can come out of their pay or lump-sum payments may be made. Shephard made a mistake on this report as to CCM's employee loans in March 2022. Del Sonno raised the error to Shephard in an email to which Shephard responded in part, "I have absolutely no excuse for my mistake on the summary . . . . All I can say is that I learned a valuable lesson and will do my very best to not make such an avoidable error in the future."

**Concerns to HR**

{¶ 81} In early May 2022, Del Sonno testified she went to HR with concerns about Shephard's lack of understanding of GAAP and her failure to pay attention to details and this is why Shephard was selected for termination in the reduction in force. Del Sonno brought up her concerns to Michelle who told Del Sonno to send what she had regarding those issues. Del Sonno was waiting for guidance from HR and was not told to put Shephard on a performance-improvement plan. Del Sonno testified that it was not her intention to cause Shephard to be terminated by going to HR.

{¶ 82} An email sent on May 3, 2022 from Del Sonno to Michelle after their meeting regarding Shephard's performance and understanding of GAAP had 78

pages of attachments demonstrating the loan receivable error and included screenshots of Teams messages. In one message, Del Sonno instructed Shephard, on March 16, 2022, to do prepaids differently and Shephard agreed to do so. Shephard was never disciplined or put on a performance-improvement plan.

{¶ 83} Scher was hired in April 2022 and began assuming Shephard's responsibilities. Del Sonno started finding the above discussed errors by Shephard in March 2022 and that is when she alerted Shephard to the errors in the prepaids and instructed her to do them differently moving forward. Del Sonno was unsure if Shephard fixed her errors and was unsure if Del Sonno directed Shephard to fix them.

{¶ 84} Del Sonno maintained that Shephard's performance was the reason why she was selected to be terminated in the reduction in force. Del Sonno admits there was no intention to terminate Shephard due to her performance in May 2022.

{¶ 85} Del Sonno did not go to HR and ask for employees' personnel files to look at the employee's performance reviews or their disciplinary history before recommending them for the reduction in force. When Agarwal asked if she could terminate anyone, Del Sonno did not immediately identify Shephard. She discussed everyone's performance with Novak and when talking about Shephard, her several errors were brought up. Del Sonno believed these errors were made because of Shephard not understanding GAAP for prepaids and accruals.

**New Hires/Open Positions**

{¶ 86} Del Sonno was 36 years old when she replaced Constantini. CCM had several new hires in 2022. Sidhu was around 34 years old when hired, and he was hired to fill Del Sonno's old position of assistant controller. Huszai was 32 years old when he was hired as the second assistant controller, a new position. Scher was 28 years old when he was hired as accounting manager, which was also a new position.

{¶ 87} A staff accountant position opened in February 2022 based on an email sent to Del Sonno and Novak from their third-party recruiter. There was an internal posting made by CCM for a staff accountant position that shows Del Sonno as the hiring manager, and this position was posted on March 2, 2022. The position says CCM is looking for someone with at least zero to three years of experience as an accountant. Del Sonno agreed that there is a likelihood a candidate will be younger if zero to three years of experience sufficed.

{¶ 88} Eight exhibits were shown to Del Sonno of applicants for the staff accountant position from March 2022 to April 2022. Many of the applicants had not graduated college or had graduated recently and had minimal or no experience.

{¶ 89} On June 13, 2022, before Shephard was terminated, there was an internal position open for senior accountant II. Tim Gnezda ("Gnezda") applied for the position. Del Sonno admits that Shephard had the qualifications with a bachelor's degree and as a CPA. Del Sonno testified that if Shephard had applied for the position Del Sonno would have interviewed her. Gnezda was offered, and

accepted, the position of senior accountant II pending a background check. CCM brought Gnezda on as a senior financial analyst in August 2022.

{¶ 90} Del Sonno admitted that in 2022 the accounting department grew in size. The number of accountants did not decrease in size and the roles increased with the addition of accounting managers, assistant controllers and staff accountants. Del Sonno maintained that after Shephard was laid off CCM did not search for, or hire, an accountant for general corporate accounting.

### Scher's responsibilities and "younger and hungrier"

{¶ 91} Shephard was employed as a senior staff accountant at CCM when Del Sonno was the controller. Scher was hired as an accounting manager on April 1, 2022. According to Del Sonno, the senior staff accountant position is not comparable to the accounting manager position. The latter involves managing people. Scher is responsible for four people's performance, management and discipline. Scher is responsible for the junior accountant, senior accountant and the staff accountant. Shephard had no one who directly reported to her.

{¶ 92} Scher's responsibilities as accounting manager included helping manage the accounts payable team. He also had four direct reports underneath him. In addition to that, he reviewed his team's monthly balance sheet reconciliations, he helped with other projects and helped Del Sonno with her projects.

{¶ 93} Del Sonno never heard Agarwal, Novak or anyone at CCM say they wanted "younger and hungrier" employees. Del Sonno has never heard or participated in any discussions about hiring younger individuals. Del Sonno worked

with Novak regarding hiring within the accounting group from February 2022 to the date of trial. Del Sonno testified that they hired Dorothy Acree to accounts payable who was in her 70s. When discussing termination, Novak never gave her the impression that age was a part of his assessment. When discussing terminating Shephard, neither Novak nor Del Sonno raised her age as a reason to include her in the layoffs.

### d. Harvey Rosen, Ph.D. – Shephard's Expert Witness

{¶ 94} Shephard's expert witness, Dr. Harvey Rosen, Ph.D. ("Rosen"), an economist, testified regarding her damages. Rosen has been an economic expert witness before and has been appointed by courts as an expert. Rosen is able, with a reasonable degree of economic certainty, to determine an individual's lost earning capacity from a particular occupation, assuming that individual was terminated and has been unable to find new employment. Shephard asked him to make such a determination for her.

{¶ 95} Specifically, Rosen was asked by Shephard to review her employment history including wages earned and benefits she received while employed at CCM. He then rendered an opinion about how she is not working and how that incident impacted her abilities or diminished her earning capacity. Rosen has no opinion about whether the termination was lawful or not.

{¶ 96} To make this determination Rosen required information including Shephard's age, when she was terminated, tax returns from 2018-2022, her

education, employment history and information from the Federal Government's Bureau of Labor Statistics & Department of Labor.

{¶ 97} Shephard was 66.3 years old at the time the report was authored on September 23, 2023 and it contains two calculations. The first was based on the actual income she had during that period of time, which was roughly $70,000. Rosen was also asked to assume similar or comparable employees at the company that were paid $85,000.

{¶ 98} Rosen's report on Shephard's economic loss relied upon several things. Rosen determined Shephard could have expected to work for an additional 3.9 years from the date of her termination based on statistics.

{¶ 99} The second basis of Rosen's report was Shephard's historical wages. In 2018 she earned $65,100. In 2019 she earned the same. In 2020 she earned $68,100, and in 2021 she had an income of $67,203. In 2022 she was terminated in June, so she had half a year of wages and earned $35,096. She was on track to earn $70,192. Rosen compared this with data from the Bureau of Labor Statistics and Department of Labor's Employment Cost Index, which measures how salaries for people in their specific job classifications go up from year to year. From 2021 to 2022 Shephard's wages were aligned with the national wage increase of 4.1 percent, totaling a little over $70,000, which is how much she would have earned at CCM had she finished out the year in 2022.

{¶ 100} Rosen next considered any fringe benefits that Shephard would have been paid. There were two main benefits: her 401K retirement plan, where CCM

matched up to 3 percent of her contribution, and payments by her employer into Medicare and Social Security which totals approximately 8.98 percent of her salary. Based on these numbers, he added 11.98 percent to her annual salary.

{¶ 101} Rosen then looked 3.9 years into the future using this information and more data from the Bureau of Labor Statistics and Department of Labor's Employment Cost Index and with inflation found there was 0 percent growth. Rosen then calculated the present value of her future wages.

{¶ 102} In summary, Rosen calculated Shephard's back pay based on her salary from 2020 to 2023 as $120,323. He then calculated her front pay, for the 3.9 years she would have likely continued working, as $277,395. In total he calculated her loss of earning capacity as $397,718.

{¶ 103} Shephard's counsel requested Rosen to calculate the loss of earning capacity for Shephard consisting of an $85,000 annual salary, which is what Scher was being paid by CCM starting in April 2022. That calculation resulted in $151,065 in back pay and $325,243 in front pay totaling $476,308 in loss of earning capacity. Her future earnings were based on the data and not on her intent to work for another two years. Rosen testified it was more likely than not that statistically Shephard would work until she is 70.2 years old despite any stated intention to retire sooner.

**e. David Constantini – Former CCM Controller**

{¶ 104} Constantini testified that he was 55 years old and had been an employee at CCM from June 2018 until February 2022 as controller. He is currently employed as the controller of shared services with Materion and is a CPA.

{¶ 105} Constantini supervised Shephard while he was employed at CCM. He was never concerned about Shephard's performance or that she did not understand GAAP. No one at CCM ever told him they were concerned about Shephard's performance, and he completed the July 2021 performance evaluation for Shephard.

## Shephard's July 2021 Performance Review

{¶ 106} An email from HR to Constantini said Shephard's review "looked good." There is no mention of putting her on a performance-improvement plan. HR approved Shephard's performance review, and they approved a merit increase in Shephard's salary. The review evaluated her performance from 2019 to May 2021.

{¶ 107} The review was done and graded by Constantini. The rating was from 1-4. As stated earlier, four means exceed expectations, three means meet expectations, two means below expectations and one means unsatisfactory. Threes and fours are sufficient. Shephard had a 3 in customer service, 4 in communication, 3 for teamwork, 3 for job knowledge, 3 for productivity, 3 for quality, 3 for judgment and decision-making, 3 for initiative, 4 for accountability and mindset. The comment under accountability and mindset states that "Cheryl is reliable, trustworthy, and I can always count on her to show up and work until her duties are complete. She's very coachable and proactive in working towards efficient processes. She takes pride in her work and welcomes feedback." Shephard's overall rating was 3.2, which falls in between meets expectations and exceeds expectations.

{¶ 108} In Shephard's performance evaluation, Constantini gave Shephard a 4 in communication and the comment below it says that "Cheryl communicates openly and accurately and reports errors and/or mistakes in a factual manner." This was not a backhanded compliment for Shephard, and he was not saying that she makes lots of errors or anything to tell her boss about. Constantini was never concerned about Shephard's job performance. Constantini considered that to be a good performance review. When Constantini resigned in February 2022 he believed Shephard was still performing at this level.

## "Younger and Hungrier"

{¶ 109} Constantini testified that Agarwal was hired by CCM in July 2021 as CFO and Novak was hired in October 2021 as vice president of finance. Constantini testified that Agarwal made comments about wanting to hire younger individuals in the accounting department. When Agarwal was hired he reviewed the accounting department and he had a conversation with Constantini about how it was short staffed. Business had quadrupled during the pandemic. When talking about who to hire for the accounting department, Agarwal said, "[W]e should get younger and hungrier." This comment was also made by Novak.

{¶ 110} Constantini reported to Agarwal prior to Novak being hired. Constantini was told in January 2022 that he would now be reporting directly to Novak, not Agarwal. This frustrated Constantini. Constantini left because of this frustration, but also because CCM had less culture and style and less of a family teamwork environment. The company grew from 1800 employees to 7000

employees during his time there. Constantini said they lost the company culture/family/teamwork environment.

{¶ 111} Constantini has not talked with Shephard since he resigned. Constantini did not know why Shephard's employment with CCM ended.

{¶ 112} Constantini testified that there was a reduction in force in February 2022 at CCM and that there was a reduction in force in February every year. Constantini testified that it is unusual for there to be a reduction in force at CCM impacting the accounting department. Constantini believed the accounting department was "lean and mean" at CCM.

{¶ 113} Constantini attributes the phrase "younger and hungrier" to Agarwal. He heard the phrase from Agarwal "three to five times in six months[,]" and heard it from Novak at least once. Constantini did not report anyone to HR for saying "younger and hungrier" since he did not feel it was made in a discriminatory manner and did not have anything to do with age. Constantini testified that hiring mortgage employees when they are younger, right "out of college, you get a clean whiteboard and then you can just train them from scratch." Younger employees are easier to train from scratch and the accounting department was short-staffed. The accounting department came out of the pandemic four to six bodies short of what they wanted and younger employees meant "no other nonmortgage accounting is messing up their brain." Constantini did not believe it was discriminatory at all. They just wanted employees that had "not been previously tainted by other forms of accounting." "Younger and hungrier" was not an ageist comment, but instead was

meant as we want "go-getters" comment. "Go-getters" can be old or young. Anyone can be "hungry" regardless of age. Constantini stated he would say he is still "hungry."

{¶ 114} Constantini agreed that as a manager and supervisor he had a responsibility to report any witnessed unlawful harassment, discrimination or retaliation. During his entire time at CCM he never reported to HR that someone was being discriminated against and none of his employees who reported to him, including Shephard, indicated that they were being discriminated against, harassed or otherwise mistreated.

{¶ 115} Constantini does not recall Shephard making the $938,867.19 accrual mistake, but such an error "would be big enough to be worried about . . . ."

{¶ 116} In light of Agarwal and Novak's comments about wanting to hire "younger and hungrier" people, if CCM started hiring several 20–30-year-old people, reassigned all of Shephard's work to them and terminated her, Constantini would be concerned that this was discriminatory behavior.

### f. Novak Novak – Vice President of Finance

{¶ 117} At the time of trial, Novak was the vice president of finance at CCM. He was hired in October 2021 by Agarwal, and he reports to Agarwal.

{¶ 118} Novak denied ever saying the words "younger and hungrier." He never indicated age should be a hiring factor. He has never heard anyone at CCM indicate age should play a role in hiring decisions or in termination decisions. Age never played a part in his decision-making processes to hire any individuals. Novak

maintained that age had nothing to do with the reasons Shephard was identified as a low performer and that he is "age blind," that age is not a qualification for a job and has nothing to do with CCM's hiring practices. Novak testified that he only talked to Shephard about five or less times.

{¶ 119} After being hired, the first external hiring decision Novak made was to extend an offer in January 2022 to Sidhu. Sidhu was hired as assistant controller on February 22, 2022, and was 33 years old at the time.

{¶ 120} When Constantini resigned, Del Sonno took his job and was 36 years old at the time of her promotion in January 2022. CFO Agarwal is younger than Novak and Agarwal was 31 when he was hired.

{¶ 121} The next hire Novak made was Scher on April 1, 2022. Scher was not a CPA. Scher was 28 years old when he was hired as an accounting manager with senior accountants, senior accountants II, and staff accountants reporting to him.

{¶ 122} Novak then hired 31-year-old Huszai on April 20, 2022 and agrees that the management in the accounting department has gotten younger under him. All hires were approved by Agarwal. Novak maintained that it was just a coincidence that all these new hires were younger.

{¶ 123} An organizational chart of CCM provided by CCM as of January 19, 2022 shows the accounting department, though it is missing some lower-level people. There were 25 people under Novak's supervision as of January 19, 2022.

{¶ 124} Attached to an August 16, 2022 email from Novak to Agarwal, two months after the reduction in force, was an organization chart. The chart shows 26

people under Novak's supervision and also shows there is an open staff accountant position in August 2022.

{¶ 125} Novak was not part of the decision-making process regarding how Shephard left CCM. He did identify Shephard as one of his low performers in accounting and that was the extent of his contribution. He learned after the fact that she was let go as part of a reduction in force.

{¶ 126} One of Novak's roles is financial planning and forecasting. The Federal Reserve started raising interest rates in March 2022 and he knew this would mean a decrease in cash flow for CCM. Novak acknowledged that cash flow and profit are very different from an accounting perspective.

{¶ 127} Despite the increase in rates and the decrease in cash flow CCM was still looking to hire a staff accountant. In March 2022, two weeks prior to the first interest rate increase, CCM had positions within accounting available such as accounts payable specialist, an accounts payable manager and a staff accountant position.

{¶ 128} Novak testified that in April 2022, CCM acquired Lend U.S. and "onboarded" 900 new employees. According to Novak this acquisition required additional accountants because they did not acquire Lend U.S.'s administration. 900 people were offered jobs at CCM.

{¶ 129} Novak conceded that every accountant makes mistakes. Every accountant who has worked for him has made errors that are discovered on the second or third review, and he would not terminate someone over one mistake.

{¶ 130} In January 2022 Shephard made the roughly $938,000 pair-off mistake. Novak never spoke with Shephard regarding this mistake. He testified though that there was a pattern of errors that he learned about regarding Shephard. Shephard's mistakes consisted of the January 2022 accrual pair-off issue and the prepaid issue in March 2022 regarding the Cleveland Brown's contract. There was also an issue in February 2022 regarding a loan receivable on a reconciliation entry in the amount of $300,157.41. Novak testified that he thought Shephard was not taking ownership of her mistakes and was deflecting and blaming Constantini.

{¶ 131} Novak testified about an email he wrote in response to an email from Shephard on May 19, 2022, regarding her main responsibilities being taken away from her. Shephard asked when they would be given back. Novak responded to Shephard on May 24, 2022, saying, "A decision has not been made, but will let you know as soon as possible."

{¶ 132} A job description for senior accountant II, revised in April 2022, was posted with the same job responsibilities as Shephard.

{¶ 133} An email came from CEO Leonhardt on June 6, 2022, regarding the reduction in force. Despite this, seven days later, Caitlyn Leslie in HR posted a job position for senior accountant II position, which was before Shephard was terminated. Novak does not think Shephard qualified for the senior accountant II position based on the errors he found in her work product.

{¶ 134} An email from recruiter Touchstone was sent on March 3, 2022, to Novak, Sidhu and Del Sonno regarding the staff accountant job description change

requiring the years of experience from 1-3 to 0-3. Staff accountant and junior staff accountant have the same job responsibilities. He requested they change it to 0-3 years of experience to get a broader group of people applying. Novak denies this was ultimately done to attract younger candidates.

{¶ 135} A Jobvite profile for the staff accountant position was posted on March 2, 2022, and updated in May 12, 2022. This posting was made two months after the Federal Reserve raised rates. Three people were interviewed in April 2022 prior to Shephard's termination. Novak has no idea as to the age of the candidates.

{¶ 136} Gnezda, age 56, applied for the position of senior accountant II on June 17, 2022 and that was the position for which he interviewed. Novak extended an offer to Gnezda for $85,000 for the position of senior accountant II, which has the same job duties as Shephard's job. CCM ultimately ended up hiring Gnezda as a senior financial analyst earning $90,000 per annum.

{¶ 137} Regarding hiring Scher, Novak wanted to be assured that everyone in accounting was cross-trained so if someone was out, the job could still get done. He also wanted Scher as a manager to know how to perform the roles he was managing. About ten percent of Scher's job was doing prepaids, fixed assets and accruals. Scher was cross-trained on many different areas within the accounting group. Scher adjusted the processes for prepaids, fixed assets and accruals to make sure they were fail-safe with checks and balances.

{¶ 138} On June 7, 2022, CCM terminated Bonazza from her senior accountant II position at loan level accounting. Within a week CCM posted the job

opening of senior accountant II. Gnezda filled this vacancy in August 2022. CCM had two more terminations, but otherwise Gnezda was the last hire made and there has been no other turnover. Since Shephard was laid off CCM has not hired anyone to do corporate accounting.

{¶ 139} Novak testified that everyone on the list in CCM's organizational chart, other than Gnezda and Dorothy Acree, was hired by somebody other than himself. There are people on the list who have been promoted or hired by him. Huszai was hired by him and Paul Sanbor ("Sanbor") was promoted into the accounting department in the position of senior accountant.

{¶ 140} The organizational chart shows that Sanbor was a staff accountant under Sidhu on the loan side but was moved to senior accountant on the corporate side at the age of 29. Jenson Sturgess ("Sturgess") was promoted into corporate and became a staff accountant in Novak's department after Shephard's termination. Sturgess was not on the August 2022 organization chart, which shows an open staff accountant position, but he does appear on the May 2023 chart. Sturgess was 27 years old at the time. On the corporate side Novak played a role in either the promotion, transfer or hire of people into his department and all of the people were ages 27-29.

{¶ 141} Novak evaluated everyone in his department and a majority got raises between March and August 2022. CCM increased salaries in 2022 and paid bonuses to people. Ms. Hart, a 34-year-old, was promoted to the accounts payable manager position. Novak was involved in hiring Erica Krook and Elizabeth

Rodriguez. Erica Krook was hired in August 2022 and she was 31 years old at the time. Elizabeth Rodriguez, age 25, was hired in September 2022 to accounts payable associate II. Novak agreed that hiring decisions and transferring decisions done by him were for employees in their late 20s and early 30s within his department.

{¶ 142} Novak testified that he hired and promoted people based on their upward mobility, which means, does the person have the opportunity and future to move forward or upward in the organization. In Novak's opinion the following employees had upward mobility: Scher, Huszai, Sadhu, Sanbor and Sturgess. Shephard did not have potential or upward mobility based on the volume of errors he was seeing. Novak terminated the director of finance, Jason Cobb. Constantini and Cobb were both terminated for their lack of knowledge, leadership or ability to adapt.

### g. Dennis Medica – CCM's Expert Witness

{¶ 143} CCM's expert witness, Dennis Medica ("Medica"), testified. He works for Medica, LLC, a forensic accounting firm. Medica is a CPA and has been for over 30 years, licensed in Ohio and Florida. Medica testified he is familiar with GAAP. Medica produces reports for litigation and will testify at trial. He has testified in state court, federal court, and before arbitration panels.

{¶ 144} Medica prepared a report for this case for CCM. Medica was hired by CCM to review the claim of losses of Shephard based on Rosen's expert report and the calculation of lost wages and benefits. He was also asked to opine on a hypothetical accounting transaction raised in Shephard's deposition.

{¶ 145} Medica testified that Shephard treated prepaid expenses erroneously by expensing the prepaid expense by the remaining months of the particular subscription. Hypothetically, according to Medica, Shephard would take a 12-month subscription and expense it over ten months. To a reasonable degree of professional certainty as an accountant, and based upon GAAP, it was Medica's opinion that Shephard was wrong to expense prepaids in this way.

{¶ 146} Medica testified regarding a hypothetical that assumed an Amazon Prime account cost $139 for a 12-month subscription. Medica stated that Shephard would, assuming the invoice was received in March, expense it over a ten-month period. That results in $13.90 being expensed per month and that is wrong and inconsistent with GAAP. It should be amortized over 12 months, which results in an expense of $11.58 every month. By expensing the higher amount using Shephard's way, the monthly charge/expense is overstated every month. To do it Shephard's way is to violate the authoritative requirements in GAAP on how to record transactions.

{¶ 147} Medica testified regarding Shephard's alleged economic losses. Medica testified that he calculated the maximum potential claim for compensation and benefits to be $160,000 when limiting the claim to a loss period of two years. Medica used the same numbers as Rosen but limited the claim to two years. Medica took issue with the growth rate of compensation of approximately 4 percent used by Rosen. Medica stated that, historically, her compensation increase was not at that level. Looking at Shephard's salaries from 2018 to 2021 she had 1.1 percent increase.

Medica also took issue with Rosen's use of Bureau of Labor Statistics' data to calculate Shephard's fringe benefits to include Social Security and Medicare expense, state unemployment insurance expense, federal unemployment taxes and workers' compensation. Medica believes those are employer expenses that are not reflected on a W-2 because they are not viewed as compensation, and therefore, it is erroneous to calculate them. Medica also took issue with Rosen disregarding Shephard's stated intent to work for two more years and to instead use the Bureau of Labor Statistics' data to determine how much longer she would have worked.

{¶ 148} On cross-examination, Medica testified that he was retained to speak in the hypothetical and to respond to Rosen's opinion. Medica did not do his own wage-loss calculation because he was not asked to do so but rather was asked to analyze the claim losses and to offer an alternative. Medica relied on Rosen's numbers for losses. Even though Medica thought Rosen's numbers were overstated (based on Shephard's growth rate and fringe benefits) Medica used Rosen's numbers to calculate her wage loss at $160,000. Medica calculated Shephard's growth rate based on her W-2s and did not consider the 4 percent raise she received in July 2021.

### h. Madhur Agarwal – Chief Financial Officer of CCM

{¶ 149} Agarwal is employed by CCM as Chief Financial Officer ("CFO") and he has been CFO since July 19, 2021. He is currently 34 years old. He was 31 years old when he was hired. Agarwal reports directly to CCM's CEO Leonhardt.

**{¶ 150}** Agarwal testified that CCM has two business models. At the basic level, the first model is for CCM to help people get a mortgage to buy a home. CCM borrows from banks to provide the mortgages. Once the mortgage is setup, CCM then sells the mortgage to government agencies like Fannie Mae, Freddie Mac and Ginnie Mae. The second business model is helping to service a loan by collecting interest and mortgage payments on a monthly basis.

**{¶ 151}** When Agarwal joined CCM in the summer of 2021, CCM was doing well due to low interest rates. His job as CFO was to evaluate the accounting department to see how things were being done and determine if there were ways to improve and professionally centralize the department. Leonhardt's goal was to do a better job closing books accurately and expediently.

**{¶ 152}** Leonhardt communicated to Agarwal that he thought the current leadership was ill-equipped to handle the company's growth. Observing how CCM functioned, Agarwal became concerned that basic things were not getting done. Bank reconciliations were not done, invoices were paid late and there was no process to pay invoices in a regular manner. Financial statements have three facets: income, balance sheet and cash flow. According to Agarwal, "[CCM] had a huge plug in [its] cash flow statement, which basically meant [CCM was] not able to tie out how the income statement and balance sheet made their way to the cash flow statement."

**{¶ 153}** Agarwal realized he needed someone to lead the effort to revamp the accounting department full-time in order to drive some of the changes the existing team was not able to achieve. Agarwal hired Novak as vice president of finance in

October 2021 to lead the finance department and implement the necessary changes in the department. Novak kept Agarwal apprised as to what he was seeing in the finance department and caught mistakes on prepaids, fixed assets and accruals in how accounting was doing these things wrong. Agarwal testified that the way Constantini was doing accruals was wrong and that was brought to his attention by Novak.

{¶ 154} Agarwal had never met Shephard. They had never been on a Zoom call together, he had never seen her in the office and never really had anything to do with her until April of 2022 when she was identified as someone who was making mistakes and errors in CCM's financials. As Leonhardt had asked Agarwal to send him a summary of the things he had improved and to quantify errors that were fixed, Agarwal had Novak and Del Sonno send him a summary to share with Leonhardt. They sent him a Google sheet spreadsheet with a summary of the errors that can be fixed and in that sheet was a screen shot of a Teams message from Shephard, which told him that Shephard was working on two or three of the items on this list. Agarwal sent an email to Leonhardt on April 11, 2022, regarding the errors that were fixed in the accounting department. During this period Agarwal learned from Novak and Del Sonno about some of the duties Shephard was performing.

{¶ 155} CCM had no idea the Federal Reserve was going to raise interest rates which it did in March 2022. Rates were raised seven times that year. CCM saw a quick decrease in the number of loans starting in March 2022. The rate hikes hit the mortgage industry hard and were unprecedented.

{¶ 156} Agarwal testified regarding CCM's financial statements from January 2022 through June 2022 which were signed by Agarwal certifying that they were complete and accurate. The statements show that during that time period, CCM's cash flow decreased by $115 million. CCM had started the year with $337 million in cash flow and lost $115 million within the first six months of the year.

{¶ 157} In an email from Scott Miller, executive vice president of financial analytics, dated May 27, 2022, was a report that was being circulated to encourage departments to discuss head counts and cost saving actions. The most recent email in this chain was from Leonhardt to Agarwal and Scott Miller on June 6, 2022 and said he wanted to get corporate expenses down .50 basis points, which is 0.5 percent of volume.

{¶ 158} In an email from Leonhardt on June 6, 2022, to the executive leadership team, Leonhardt asked the executives to do a thorough review of their costs to find inefficiencies and savings and stated that it is now time to upgrade the departments and move on from low performers.

{¶ 159} Shephard was recommended to Agarwal for inclusion in the corporate layoff. Approximately 80 people were laid off from June 20, 2022 to July 28, 2022.

{¶ 160} Agarwal testified as to a list of individuals who were included in the corporate layoffs in June and July 2022. Layoffs were for cost savings. The only person in the accounting department on Agarwal's list was Shephard.

{¶ 161} According to Agarwal, CCM was looking in multiple places for cost savings, including reviewing and, when possible, renegotiating contracts CCM has with banks. CCM put on hold noncritical or unnecessary corporate travel. CCM canceled employees' corporate credit cards. Agarwal issued a new expense policy in June 2022 limiting what people could spend. For example, the policy said people could expense dinner only if they worked past 8:00 p.m. in the office.

{¶ 162} CCM's purchase of Lend U.S. occurred in January 2022, before the interest rate increase in March 2022 and was finalized on April 25, 2022. Lend U.S. had about 900 people in their organization. Half those people joined CCM, mainly loan originators, people who go out in the field working with borrowers and homeowners to get them a mortgage. Loan originators bring in volume that leads to profits.

{¶ 163} Agarwal denied ever saying "younger and hungrier" to anyone. He testified that he would never say that. The first time he heard that phrase was at his deposition. Agarwal never heard Novak say that either. Agarwal has never heard anyone at CCM say "younger and hungrier."

{¶ 164} On cross-examination, Agarwal testified that as a result of the rate increase, CCM saw a decrease in cash flow and needed to make changes, which included a reduction in force of 89 employees from June 2022 to July 2022.

{¶ 165} Agarwal agreed that Novak was hired to make decisions in the finance department and Agarwal did not want to micromanage him. Agarwal was in constant communication with Novak and was aware of Shephard and her alleged

performance issues leading up to her layoff. Agarwal had never heard of any performance issues with Shephard prior to receiving an April 11, 2022 email from Novak and Del Sonno. He was aware that she focused on prepaids, fixed assets and accruals.

{¶ 166} Six months of financials that Agarwal signed off on from January to June 2022 were offered. Member equity, or book value of equity, as of January 2022 was $957 million. For June 2022 the statements show member equity as $1.076 billion. Agarwal testified that through June 2022 CCM's net income was $212 million. Agarwal did not take any pay cuts during this time, and he received his full bonus of $400,000 in 2022.

### i. Jury Instructions

{¶ 167} After the presentation of trial testimony, both parties rested. Outside the presence of the jury, the parties argued over jury instructions. The parties agreed, at CCM's counsel's urging, to add language to the jury instruction Depositions, Transcripts and Interrogatories, under the "Use of Answers to Interrogatories" section as follows: "Parties are entitled to include legal objections to such written questions, which objections cannot be used against a party as an admission."

### j. Jury Verdicts and Interrogatories Issues

{¶ 168} The jury reached a verdict in this case and answered the interrogatories. The jury found by the greater weight of the evidence that Shephard's age was a determining factor in CCM's decision to terminate her

employment on June 20, 2022. The jury found by the greater weight of the evidence that Shephard's disability was not a determining factor in CCM's decision to terminate her employment on June 20, 2022.

{¶ 169} The jury found the greater weight of the evidence did not support a finding that Novak aided, abetted, incited, compelled or coerced CCM to discriminate against Shephard because of her age. The jury found the greater weight of the evidence did not support a finding that Novak aided, abetted, incited, compelled or coerced CCM to discriminate against Shephard because of her disability.

{¶ 170} The jury awarded Shephard $151,065 in back pay, $243,932 in front pay and $150,000 in pain and suffering and mental anguish. Total compensatory damages were $544,997.

{¶ 171} The jury filled out a general verdict form for Shephard against CCM but marked the total amount of compensatory damages as $455,003. The trial court recognized the discrepancy between the interrogatory response and the award amount in the general verdict and sent the jury back to reconcile the difference. The jury returned with a general verdict form for Shephard awarding $544,997 in compensatory damages.

{¶ 172} CCM then raised three issues with the jury interrogatories and general verdict form. The first issue was that interrogatory No. 5 did not have a place for the jurors to sign the form. The second issue CCM raised was that two jurors (juror Nos. 1 and 8) did not sign onto interrogatory No. 1, but did sign the general

verdict form against CCM. The third issue was the general verdict form finding for Novak against Shephard was not signed by the jurors. CCM requested the court to have the jury sign interrogatory No. 5 and the general verdict form for Novak and then asked the trial court to question juror Nos. 1 and 8, individually, to ascertain their intention in not signing interrogatory No. 1 but signing the general verdict form. The court acquiesced to CCM's requests.

{¶ 173} The court then called juror No. 1, who did not sign interrogatory No. 1, but signed the general verdict form against CCM. Juror No. 1 stated the jury thought everyone needed to sign the general verdict form. Juror No. 8 was brought out and questioned as well. Juror No. 8 stated that he thought every juror needed to sign the general verdict form. Juror No. 8 would not have signed the general verdict form if he had known he did not have to.

{¶ 174} The court sent back to the jury the general verdict form to have jurors Nos. 1 and 8 cross out their signatures and initial and date the cross out, which CCM agreed was proper. The court also created a signature page for interrogatory No. 5 for the jurors to sign, which both parties agreed was the proper remedy. Last, the court instructed the jury to sign the general verdict form finding for Novak.

{¶ 175} The jury had additional questions after being sent back. They were confused about whether they had to sign the general verdict form for CCM, despite finding against CCM. The second question was whether the two jurors who found against Shephard had to sign the general verdict form for CCM. The court and the parties agreed that the proper response to the jury was not to worry about signing

the general verdict form for CCM since they had already found against CCM.  Both parties reviewed the forms and interrogatories from the jury and agreed they were proper.

{¶ 176} CCM then moved for a mistrial based on this jury confusion regarding the interrogatories and verdict forms, which the trial court denied.  CCM also renewed its motion for a directed verdict regarding punitive damages arguing there is no clear and convincing evidence of actual malice.  The trial court denied CCM's motion for a directed verdict.

{¶ 177} The trial then transitioned to the punitive phase.

### k.  Punitive Damages Testimony and Proceedings

{¶ 178} During the punitive-damages phase, CCM called Agarwal to testify. Agarwal testified that upon review of the company's audited financials for 2022, they show that when comparing them to the 2021 financials one can see CCM's income went down from $630 million to $220 million, a decrease of 75 percent. Looking at the 2023 financials, the income went down from $220 million to $40 million, an 80 percent decrease.  Agarwal testified that CCM is required to have 3 percent of their assets liquid, which is $125 million, and CCM only had $137 million so CCM did not have a lot of excess cash.

{¶ 179} Agarwal testified that because of the jury's verdict CCM has decided to engage outside counsel moving forward to the extent there are any subsequent corporate layoffs.

{¶ 180} On cross-examination Agarwal testified that he is aware that it is illegal to terminate somebody because of their age. Doing so violates state and federal laws. The report of independent auditors and consolidated financial statements for CrossCountry Mortgage HoldCo, LLC, the holding company of CCM, show that there is a private plane the company has for Leonhardt who uses it for business purposes. The holding company had an older plane that they sold and bought a new one at the end of 2021 before the changes in the industry.

{¶ 181} According to the 2022 financial statements, total assets for CCM were $4.2 billion. The financial statements show members' equity was $1,083,988,000 at the end of 2022. Liabilities and members' equity totaled $44.2 billion. Agarwal stated that this is the company's book value, which is inflated compared to its market value by about 25-30 percent. Book value does not take into account market conditions, which had been bad the last two years.

{¶ 182} Agarwal agreed that one thing that reduces CCM's cash position is distributions made to members. In 2021, CCM distributed $603 million to members. CCM's operating agreement requires it to distribute money to the members to pay taxes and that money distributed to members does not go into members' pockets. Agarwal stated that CCM distributed 40 percent of taxable income.

{¶ 183} On redirect examination Agarwal testified that he does not personally think CCM discriminated against Shephard by terminating her. He never witnessed anything internally about the corporate layoff demonstrating a hatred

toward Shephard. Agarwal was given a directive to find bottom performers whose duties could be reallocated. He testified that there was no ill intention or malice to discriminate against anyone for any reason. Agarwal had the best interests of CCM in mind.

{¶ 184} After Agarwal finished testifying, CCM renewed its motion for a mistrial as to the issue of the jury instruction and renewed its motion for a directed verdict in respect to punitive damages. The court denied both motions.

{¶ 185} The court then provided the jury instructions regarding punitive damages as well as an interrogatory and verdict form. After deliberating, the jury returned with the interrogatory and verdict. The interrogatory asked if the jury found, by clear and convincing evidence, that punitive damages should be assessed against CCM to which the jury answered yes. The jury then assessed $1,250,000 in punitive damages against CCM. The jury also found that CCM is liable for Shephard's attorney's fees and signed a general verdict form for Shephard against CCM.

III. **Law and Analysis**

   a. **Motion for Directed Verdict per Civ.R. 50(A) and Motion for JNOV Civ.R. 50(B)**

{¶ 186} CCM's third and fourth assignments of errors allege the trial court committed reversible error by denying its motions for directed verdict and denying its post-trial motions for judgment notwithstanding the verdict ("JNOV") regarding

Shephard's age-discrimination claim and punitive damages. These two assignments of error will be addressed together.

{¶ 187} At the end of the compensatory-damages phase of the case, CCM made an oral motion for a directed verdict regarding Shephard's age- and disability-discrimination claims as well as her claim for punitive damages. CCM argued that there was not legally sufficient evidence for a jury to find Shephard was discharged because of her age or disability and that there was not legally sufficient evidence to support a finding of punitive damages. The trial court denied CCM's motion for directed verdict.

{¶ 188} CCM filed an initial motion for JNOV and on April 22, 2024, an amended motion for JNOV. In its amended motion, CCM moved the trial court for judgment arguing Shephard failed to prove her separation of employment from CCM was motivated by discriminatory intent. CCM also argued that the punitive damages award was not supported by clear and convincing evidence of "actual malice." On June 10, 2024, the trial court denied CCM's amended motion for JNOV.

{¶ 189} Directed verdicts are governed by Civ.R. 50(A). Pursuant to Civ.R. 50(A)(4), if the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue. Civ.R. 50(A) motions for directed verdict do not present factual issues, but instead present

questions of law. *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 25. The reasonable-minds test requires the court to determine whether there is any evidence of substantive probative value that favors the nonmoving party. *Rieger v. Giant Eagle, Inc.*, 2019-Ohio-3745, ¶ 9. When deciding a motion for a directed verdict the court must "review and consider the evidence." (Internal citations omitted.) *Id.*

{¶ 190} A court's decision whether to grant or deny a motion for a directed verdict under Civ.R. 50(A)(4) is a question of law that this court reviews de novo. *Rieger* at ¶ 8, citing *White v. Leimbach,* 2011-Ohio-6238, ¶ 22. "Faced with the question of sufficiency through a directed verdict motion, the court must determine whether any evidence exists on every element of each claim or defense for which the party has the burden to go forward." *Eastley* at ¶ 25.

{¶ 191} Motions for JNOV are governed by Civ.R. 50(B). A motion for JNOV challenges the legal sufficiency of the evidence and applies the same standard as a motion for directed verdict. *Austin v. Chukwuani,* 2017-Ohio-106, ¶ 19 (8th Dist.). "The trial court does not weigh or consider the credibility of the witnesses, but rather, reviews and considers the sufficiency of the evidence as a matter of law." *Siebert v. Lalich*, 2006-Ohio-6274, ¶ 15 (8th Dist.). A motion for JNOV should only be granted if the movant is entitled to judgment as a matter of law when the evidence is construed most strongly in favor of the nonmovant. *Id.* at ¶ 14. This court employs a de novo standard of review in evaluating the grant or denial of a motion for JNOV. *Austin* at ¶ 19.

{¶ 192} First, we review CCM's arguments that the trial court erred by denying its directed verdict and JNOV regarding Shephard's age-discrimination claim.

### i. Shephard's Age-Discrimination Claim

{¶ 193} CCM argues that Shephard failed to present sufficient, competent evidence to support her age-discrimination claim under R.C. Ch. 4112. We disagree.

{¶ 194} Pursuant to R.C. 4112.14(A): "No employer shall . . . discharge without just cause any employee aged forty or older who is physically able to perform the duties and otherwise meets the established requirements of the job and laws pertaining to the relationship between employer and employee." *Montague v. Oakwood Club*, 2003-Ohio-876, ¶ 16 (8th Dist.).

{¶ 195} "In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), the United States Supreme Court 'established a flexible formula to ferret out impermissible discrimination in the hiring, firing, promoting, and demoting of employees.'" *Montague* at ¶ 17, quoting *Plumbers & Steamfitters Joint Apprenticeship Commt. v. Ohio Civ. Rights Comm.*, 66 Ohio St.2d 192, 197 (1981).

> The *McDonnell Douglas* analysis involves a three-step procedure that allocates the shifting burdens of production of evidence to the parties. Under this analysis, the employee must first establish a prima facie case of age discrimination. Next, the burden of production shifts to the employer to state some legitimate non-discriminatory reasons for its action. Finally, the burden shifts back to the employee to show that the employer's stated reasons were a pretext for age discrimination.

*Peters v. Highland Hills*, 2024-Ohio-2366, ¶ 32 (8th Dist.); citing *Wang v. Goodyear Tire & Rubber Co.*, 68 Ohio App.3d 13, 16 (9th Dist. 1990), citing

*McDonnell Douglas Corp.* at 802 and *Barker v. Scovill, Inc.*, 6 Ohio St.3d 146 (1983). Under this analysis, Shephard must first set forth a prima facie case of age discrimination. A prima facie claim for age discrimination may be proven by direct or circumstantial evidence. *Peters* at ¶ 33. Direct evidence is "[e]vidence that directly proves a fact, without an inference or presumption." *Mauzy v. Kelly Servs., Inc.*, 75 Ohio St.3d 578 (1996).

{¶ 196} The Ohio Supreme Court has held that

> absent direct evidence of age discrimination, in order to establish a prima facie case of a violation of R.C. 4112.14(A) in an employment discharge action, a plaintiff-employee must demonstrate that he or she (1) was a member of the statutorily protected class, (2) was discharged, (3) was qualified for the position, and (4) was replaced by, or the discharge permitted the retention of, a person of substantially younger age.

*Coryell v. Bank One Trust Co. N.A.*, 2004-Ohio-723, ¶ 20. Qualification for the position is reviewed objectively taking into consideration the employee's education, experience, and skills. *Peters* at ¶ 35.

{¶ 197} If a plaintiff establishes a prima facie case of discrimination, the second step of the *McDonnell Douglas* framework shifts the burden to the employer "to rebut the presumption of discrimination by presenting evidence of some legitimate, nondiscriminatory reason for its action." *Peters* at ¶ 37, quoting *Kenner v. Grant/Riverside Med. Care Found.*, 2017-Ohio-1349, ¶ 28 (10th Dist.). This is a burden of production, not persuasion, and is satisfied if the employer "'introduce[s] evidence which taken as true, would permit the conclusion that there was a

nondiscriminatory reason for the adverse action.'" *Peters* at ¶ 37, quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993).

{¶ 198} If the employer's burden is satisfied, the burden shifts back to the plaintiff to show the reason given is pretextual and the real reason was discrimination. To demonstrate pretext, a plaintiff must ultimately establish that both the employer's stated reason for the adverse employment decision "was not the real reason for its action, and that the employer's real reason" was discrimination. *Peters* at ¶ 41, quoting *E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 767 (6th Cir. 2015).

{¶ 199} CCM argues that Shephard failed to present sufficient competent evidence to support the jury's verdict finding age discrimination under R.C. Ch. 4112. We disagree. Review of the trial transcript shows that Shephard put forth sufficient direct and indirect evidence to establish a prima facie case of discrimination. The direct evidence of Constantini's testimony that Agarwal and Novak both used the phrase "younger and hungrier" to describe what they wanted the corporate accounting department to be is sufficient direct evidence to support age discrimination since it does not require any inference or presumption.

{¶ 200} Notwithstanding that, Shephard also presented indirect evidence of discrimination. Shephard is a member of the protected class since she is over 40 years old, she was subject to an adverse employment decision when she was terminated, she was a CPA and, therefore, qualified for the job of senior accountant and she presented evidence that she was replaced by Scher who is substantially younger at age 29 when he was hired. *Peters* at ¶ 33.

{¶ 201} Because Shephard presented sufficient evidence to establish a prima facie claim for age discrimination, the burden then shifts to CCM to rebut the presumption of discrimination by presenting evidence of some legitimate nondiscriminatory reason for terminating Shephard. *Peters* at ¶ 37. At trial, CCM put forth several legitimate nondiscriminatory reasons for why Shephard was terminated. CCM stated that Shephard was chosen for termination in a reduction in force layoff because she was determined to be a low performer who had made several mistakes. These mistakes included the accrual that had a $938,867.19 discrepancy, the alleged improper way she treated prepaid subscriptions and how she handled fixed assets at closed branches. CCM also said she was terminated because the rising interest rates required CCM to reduce its costs. CCM also stated that she was terminated because her position was eliminated.

{¶ 202} Having rebutted the presumption of discrimination, the burden shifted back to Shephard to demonstrate that the reasons given by CCM are pretextual and not the real reason she was terminated and that the real reason was discrimination. Shephard put forth evidence at trial that she was not a low performer as she had above-average reviews from Constantini, she was doing her work as she had been instructed, she was never reprimanded for any mistakes she made and was never put on any performance plans by HR. She put forth evidence that management stated they wanted "younger and hungrier" people in accounting and that significantly younger people were hired in the accounting department. Shephard also put forth evidence that, despite alleging the need to cut costs because

of higher interest rates in March 2022, the accounting department hired several new people from March 2022 to June 2022 that added $345,000 in annual salaries. Lastly, despite alleging her position was eliminated, her three main job duties were not stopped, but instead were taken over by Scher. She also put forth evidence that CCM had a job posting for a senior accountant II, Shephard's position at CCM, from April 2022 until the position was filled by Gnezda. We find Shephard presented sufficient evidence to establish that the reasons given by CCM were pretextual. *Peters* at ¶ 41.

{¶ 203} On our de novo review, construing the evidence most strongly in favor of Shephard, reasonable minds cannot come to one conclusion favoring CCM because there is sufficient evidence to support every element of Shephard's age-discrimination claim. As such we affirm the trial court's denial of CCM's motions for directed verdict and JNOV regarding Shephard's age-discrimination claim.

### ii.  Shephard's Punitive-Damages Claim

{¶ 204} CCM alleges in its fourth assignment of error that the trial court improperly denied its motions for a directed verdict and JNOV regarding Shephard's claim for, and jury verdict award of, punitive damages. CCM also alleges the jury's verdict is against the manifest weight of the evidence. We disagree.

{¶ 205} Where a judgment is supported by competent and credible evidence going to all the essential elements of the case, a reviewing court will not reverse the judgment as being against the manifest weight of the evidence. *Vedder v.*

*Warrensville Hts.,* 2002-Ohio-5567, ¶ 76 (8th Dist.), citing *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279 (1978).

{¶ 206} R.C. 4112.99 authorizes an award of punitive damages upon evidence of actual malice in civil employment discrimination actions brought pursuant to the statute. *Vedder* at ¶ 68, citing *Rice v. CertainTeed Corp.,* 84 Ohio St.3d 417 (1999). A plaintiff bears the burden of establishing entitlement to punitive damages by clear and convincing evidence. *Kelley v. Sullivan*, 2018-Ohio-1410, ¶ 13 (8th Dist.), citing *Whetstone v. Binner*, 2016-Ohio-1006, ¶ 20.

{¶ 207} The "actual malice" necessary for purposes of an award of punitive damages has been defined as "'(1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm.'" (Internal citations omitted.) *Hawes v. Downing Health Technologies L.L.C.*, 2022-Ohio-1677, ¶ 78 (8th Dist.). "Malice may be inferred from conduct." *Thomas v. Columbia Sussex Corp.*, 2011-Ohio-17, ¶ 44 (10th Dist.), citing *Detling v. Chockley*, 70 Ohio St.2d 134 (1982), *overruled on other grounds*, *Cabe v. Lunich*, 70 Ohio St.3d 598 (1994).

{¶ 208} "A conscious disregard of the right not to be subject to age discrimination is sufficient to allow the award of punitive damages." *Thomas* at ¶ 44, citing *Atkinson v. Internatl. Technegroup, Inc.*, 106 Ohio App.3d 349, 363, (1st Dist. 1995) (affirming an award of punitive damages because the evidence upon

which it found intentional discrimination was also sufficient to show a conscious disregard for the plaintiff's right not to be subjected to age discrimination.).

{¶ 209} CCM argues that Shephard failed to present clear and convincing evidence of actual malice, specifically that there was no evidence that CCM had a conscious disregard for Shephard's rights and that this disregard had a great probability of causing her substantial harm. We disagree.

{¶ 210} A review of the record demonstrates there is sufficient evidence to support an award of punitive damages as there was a conscious disregard for Shephard's right not to be discriminated against by CCM and that had a great probability of causing substantial harm and did, in fact, cause substantial harm to Shephard. *Thomas* at ¶ 44.

{¶ 211} Wherefore, regarding the motion for directed verdict as to the issue of punitive damages, we find the trial court properly denied CCM's motion by finding reasonable minds could differ as to the finding of actual malice, such that the issue was properly submitted to the jury.

{¶ 212} Regarding the motion for JNOV, Shephard made the same arguments as those for directed verdict. We find, upon review of the extensive record made at trial, that the jury's verdict award of punitive damages was supported by competent, clear and convincing evidence going to all essential elements and we will not reverse it as against the manifest weight of the evidence. *Vedder,* 2002-Ohio-5567 at ¶ 76, citing *C.E. Morris Co.,* 54 Ohio St.2d at 279.

{¶ 213} We overrule CCM's third and fourth assignments of error.

**b. Motions for a New Trial Pursuant to Civ.R. 59(A)**

{¶ 214} CCM's remaining assignments of error Nos. one, two, five and six allege that the trial court erred in denying CCM's various motions for a new trial. Upon review, we find the trial court did not abuse its discretion in denying these motions.

{¶ 215} Throughout the ten-day jury trial CCM made several motions for a new trial. CCM alleges that the trial court improperly permitted questions regarding CCM's discovery responses and denied its request to recall Shephard to the stand; improperly allowed the introduction of evidence regarding the severance agreement and denied a curative instruction regarding the agreement; improperly redacted trial exhibit EEEE and improperly denied a new trial based on jury confusion and inconsistencies regarding the jury interrogatories and verdict forms.

{¶ 216} Pursuant to Civ.R. 59(A):

> A new trial may be granted to all or any of the parties and on all or part of the issues upon any of the following grounds: (1) Irregularity in the proceedings of the court, jury, magistrate, or prevailing party, or any order of the court or magistrate, or abuse of discretion, by which an aggrieved party was prevented from having a fair trial.

"'It is well-settled law that the decision on a motion for a new trial pursuant to Civ.R. 59 is within the discretion of the trial court.'" *C4 Polymers, Inc. v. Huntington Natl. Bank*, 2015-Ohio-3475, ¶ 51 (8th Dist.), quoting *Sharp v. Norfolk & W. Ry. Co.*, 72 Ohio St.3d 307, 312 (1995). An abuse of discretion occurs when a court exercises its judgment in an unwarranted way regarding a matter over which it has discretionary authority. *Johnson v. Abdullah*, 2021-Ohio-3304, ¶ 35.

{¶ 217} The general principle that guides admission of evidence is that "[a]ll relevant evidence is admissible . . . ." *State v. Morris*, 2012-Ohio-2407, ¶ 11, citing Evid.R. 402. The trial court's discretion to admit or exclude evidence is broad "so long as such discretion is exercised in line with the rules of procedure and evidence." *Rigby v. Lake Cty.*, 58 Ohio St.3d 269, 271 (1991). Similarly, the scope of cross-examination and the admissibility of evidence during cross-examination are matters which rest in the sound discretion of the trial judge. *Vedder*, 2002-Ohio-5567, at ¶ 79. "Thus, when the trial court determines that certain evidence will be admitted or excluded from trial, it is well established that the order or ruling of the court will not be reversed unless there has been a clear and prejudicial abuse of discretion." (Internal citations omitted.) *Id.*

### i. Assignment of Error No. 1: Questions regarding CCM's discovery responses, recalling Shephard, and motion for a new trial

{¶ 218} CCM alleges the trial court erred by permitting cross-examination questioning and testimony regarding CCM's discovery responses and denied its subsequent request to recall Shephard to ask her similar questions. CCM alleges the court abused its direction by not granting CCM's motion for a new trial based on these issues. We disagree.

{¶ 219} The specific questioning that CCM is alleging was an error was to permit the questioning of Michelle in her capacity as a Civ.R. 30(B)(5) corporate representative for CCM regarding CCM's discovery responses. CCM argues that

opposing counsel improperly led the jury to believe that the legal objection to this discovery response was a binding admission on CCM.

{¶ 220} The request for production of documents sought the following: "[p]lease produce all of [Shephard's] performance reviews and/or documents reflecting [Shephard's] performance to the extent not contained within her personnel file." CCM responded as follows:

> RESPONSE: Objection. Request for Production of Documents No. 6 is overly broad in time frame and scope, vague and ambiguous with respect to the meaning of the phrase "documents reflecting the [Shephard's] performance," unduly burdensome, not proportional to the needs of the case, and *seeks documents that are not relevant to the claims and defenses in this action*. Subject to and without waiving the foregoing objections, responsive documents that were discovered during a reasonable search, including copies of [Shephard's] performance reviews and documents addressing [Shephard's] job performance, will be produced.

(Emphasis added.) Michelle was questioned under cross-examination regarding this response that stated in part that Shephard's performance reviews "are not relevant to the claims in defenses of this action." Michelle was questioned as follows:

> Q. We requested documents related to Ms. Shephard's performance?
>
> A. Yes.
>
> Q. In response, you objected, which you are allowed to do, and a lot of these objections are things that lawyers argue about, scope, right, all these things. And then after all of those objections, comma, and seeks request for production of documents number six, seeks documents that are not relevant to the claims and defenses in this action?
>
> A. Uh-huh.
>
> Q. So in February of 2023, documents related to plaintiff's performance were not relevant to the claims and defenses in this action?

A. That's what it says, yes.

CCM objected to this line of questioning. It should be noted that Michelle was the corporate representative who verified that these discovery responses were true. This questioning on cross-examination was not put forth as a binding admission of CCM, regarding CCM's responses to discovery. Rather this questioning related to CCM's lawyer's objections to discovery and was offered as evidence of CCM's credibility in that CCM had provided shifting reasons for her termination over the course of litigation. *See State v. Braun*, 2009-Ohio-4875, ¶ 142 (8th Dist.), citing *State v. Slagle*, 65 Ohio St.3d 597, 605 (1992), quoting Evid.R. 611(B) ("Cross-examination is 'permitted on all relevant matters and matters affecting credibility.'") This testimony was within the trial court's discretion to permit.

{¶ 221} CCM also argues that the trial court improperly denied it the opportunity to call Shephard back to the stand after Michelle's testimony was concluded. We find that CCM had the opportunity to question Shephard on any relevant matters while she was on the witness stand and failed to question her regarding her discovery responses. CCM also had the opportunity, while Michelle testified to rectify any perceived inconsistency in the reason for Shephard's termination and CCM's discovery responses.

{¶ 222} A review of the record demonstrates that the admission of this evidence does not constitute reversible error. The trial court did not abuse its discretion in permitting this testimony regarding CCM's discovery responses.

Similarly, the trial court did not abuse its discretion in denying CCM the opportunity to question Shephard a second time.

{¶ 223} Furthermore, even if there was an error with this questioning, the curative instruction that CCM requested and was approved by the parties, which was given to the jury, would have corrected any alleged error. *State v. West*, 2020-Ohio-3434, ¶ 17, (10th Dist.) ("[A]ny arguable problem was cured by the trial court's curative instruction.") "A presumption always exists that the jury has followed the instructions given to it by the trial court." *Pang v. Minch*, 53 Ohio St.3d 186, 195 (1990).

{¶ 224} Because the trial court did not abuse its discretion regarding these discovery responses, there was no error in denying CCM's motion for a new trial on this issue. CCM's first assignment of error is overruled.

### ii. Assignment of Error No. 2: Introduction of severance agreement, denial of curative instruction, refusal to requestion Shephard, and motion for a new trial

{¶ 225} During Michelle's testimony as a corporate witness, Shephard's counsel asked her questions regarding the severance agreement CCM provided Shephard when she was terminated. Prior to trial, the admittance of the severance agreement was the subject of a motion in limine by CCM who argued that Evid.R. 408 prohibited the introduction of evidence of an offer to compromise. The trial court denied this motion but did order the monetary amount of the severance payment to be redacted.

{¶ 226} The OWBPA statute is a federal law that governs, among other things, the effect of waivers or releases of claims under the federal Age Discrimination in Employment Act ("ADEA") statute. For a release to be valid under OWBPA it must meet certain requirements. One such requirement is that an individual must be given either 21 or 45 days to review the agreement depending on whether an employee was terminated alone or with a group or class of employees. *See* 29 U.S.C. 626(f)(1)(F)(i)-(ii).

{¶ 227} At trial, upon reviewing Shephard's severance agreement, Michelle testified that Shephard's severance agreement only provided her with 21 days to review the agreement. The trial court properly found that the severance agreement was not offered as evidence of compromise, but was instead offered as additional evidence that CCM did not terminate Shephard in a reduction in force since her agreement did not provide her with 45 days to review the severance agreement.

{¶ 228} Evid.R. 408 does not prohibit the introduction of a severance agreement under these circumstances. Under Evid.R. 408, evidence of an offer of compromise "is not admissible to prove liability for or invalidity of the claim or its amount." The rule specifically allows for evidence of offers of compromise to be "offered for any other purpose." Evid.R. 408. "In other words, Evid.R. 408 does not bar information from settlement negotiations when it is offered for another purpose and not to prove liability against one of the parties to the negotiations." Here, because the agreement was offered to show CCM's inconsistent explanations of Shephard's termination, Evid.R. 408 does not apply to the agreement in this case

and the trial court properly denied CCM's motion in limine concerning the agreement.

{¶ 229} Furthermore, at the end of trial CCM's counsel offered the severance agreement, Shephard's exhibit No. 13, into evidence:

> MS. QUAN: For defendants we would a offer Defendant's Exhibit A, D, E, F, G, J, L, M, O, Q, R, S, U, V, W, X, Y, Z, AA, CC, GG, XX, YY, EEEE, FFFF, LLLL, RRRR, GGGGG, QQQQQ, RRRRR, SSSSS, UUUUU, and the redacted Plaintiff's Exhibit 13.

CCM cannot complain there was an error in the severance agreement's introduction into evidence when it offered the agreement into evidence itself. "A party waives his right to assign as error the admissibility of evidence if he fails to object at the moment of its admission." *Parma v. Silvis*, 2007-Ohio-1157, ¶ 15 (8th Dist.). Not only did CCM fail to object to the agreement the moment it was admitted, CCM offered the admission of the exhibit itself, waiving its right to assign its admission as an error. *Id.*

{¶ 230} CCM also alleges that the trial court erred by refusing to allow CCM to recall Shephard to testify regarding the severance agreement. We find no error here because CCM had ample opportunity to cross-examine Shephard regarding the severance agreement when she was on the stand but failed to do so. They also had the opportunity to have Michelle testify regarding the agreement to elicit whatever information CCM wanted the jury to hear. As such, the trial court did not abuse its discretion in denying CCM a second chance to question Shephard.

{¶ 231} After the verdict on the liability and compensatory-damages phase was completed, CCM requested, prior to the jury's deliberation in the punitive-damages phase, a curative instruction on the limited use of severance agreements and the relevance of the agreement language. The trial court denied the proposed instruction. "A trial court's decision to grant or deny a requested jury instruction is reviewed under an abuse of discretion standard." *State v. Dawson*, 2017-Ohio-965, ¶ 37 (8th Dist.), citing *State v. Williams*, 2009-Ohio-2026, ¶ 50 (8th Dist.). This denial was well within the trial court's discretion and the decision was not unreasonable, unconscionable or arbitrary such that we do not find any abuse of discretion or error in the denial since no curative instruction was necessary.

{¶ 232} Lastly, because we have found the trial court did not abuse its discretion in this matter, we find the trial court properly denied CCM's motion for a new trial based on the admission of the severance agreement. CCM's second assignment of error is overruled.

### iii. Assignment of Error No. 5: motion for a new trial regarding redaction of CCM's exhibit EEEE

{¶ 233} CCM argues that the trial court committed reversible error when it redacted a portion of CCM's trial exhibit EEEE which was a text message from Shephard to her daughter and son-in-law. At trial Shephard testified regarding exhibit EEEE, which stated:

> Had a call with the attorneys today. CCM is asking for a number that we could live with to not go to trial. Attorneys are saying $400,000. That would make up for 5 years of earnings (had planned to work for another 2 years, but as they said – I might have had to work longer).

Trial would be so much more. This is crazy. Then I started to dream of that indoor pool addition.

{¶ 234} Prior to trial, Shephard's counsel made a motion in limine to exclude trial exhibit EEEE as evidence of a settlement negotiation pursuant to Evid.R. 408 because it was sent at a time when the parties were engaged in presuit negotiations. As a proposed resolution Shephard's counsel suggested redacting the "$400,000." CCM's counsel did not object to that proposal.

{¶ 235} During trial, but before the exhibit was introduced, Shephard's counsel renewed its motion in limine arguing that "5 years of earnings" should also be redacted as a communication by her lawyer, to which CCM objected.

{¶ 236} The trial court redacted the "$400,000" and the "5 years of earnings" from the exhibit, and the jury did not see those words.

{¶ 237} CCM alleges the trial court erred in making these redactions. We find that regarding the first redaction, "$400,000," CCM's counsel did not object to it thereby waiving this objection on appeal unless there was plain error. *State v. Smith*, 2010-Ohio-653, ¶ 7, (8th Dist.) ("It is well-established that a party's failure to object . . . waives all objections unless there is plain error."). An error does not constitute plain error unless, but for the error, the outcome of the trial clearly would have been otherwise. *State v. Hill*, 2011-Ohio-2523, ¶ 9 (8th Dist.) This alleged error does not constitute a plain error because the outcome of the trial was not clearly affected by the alleged error. We find no plain error in this redaction as the trial court was well within its discretion.

{¶ 238} As to the other redacted section, the trial court was within its discretion to redact the "5 years of earnings" from the exhibit pursuant to Evid.R. 408 since this was evidence of the amount of the claim made during negotiations. *Werts v. Goodyear Tire & Rubber Co.*, 2009-Ohio-2581, ¶ 40 (8th Dist.) ("Under Ohio Evid.R. 408, admission of evidence of settlements or settlement negotiations is prohibited when offered to prove . . . the amount of a claim."). The trial court did not abuse its discretion in redacting this exhibit before it was introduced to the jury.

{¶ 239} Because the trial court did not abuse its discretion regarding this exhibit, CCM's motion for a new trial was properly denied.

{¶ 240} CCM's fifth assignment of error is overruled.

### iv. Assignment of Error No. 6: motion for a new trial because of material irregularities in trial court proceedings regarding inconsistencies in jury interrogatories/verdicts

{¶ 241} In its last assignment of error, CCM alleges the trial court abused its discretion by denying its motion for a new trial based on the material irregularities in the trial court proceedings. Specifically, CCM argues that there was jury confusion regarding the interrogatories and verdict forms that resulted in an unfair trial for CCM. We disagree.

{¶ 242} Pursuant to Civ.R. 49(B):

When a jury's answers to interrogatories are inconsistent with a general verdict reached by the jury, the trial court must choose among the three options set forth in Civ.R. 49(B): (1) enter judgment in accordance with the interrogatory answers, (2) return the jury for further consideration of the interrogatories and the general verdict, or (3) order a new trial.

> The choice of one of the three options lies within the sound discretion of the trial court.

*Colvin v. Abbey's Restaurant*, 85 Ohio St.3d 535 (1999).

{¶ 243} CCM alleges several inconsistencies in the jury interrogatories and general verdict forms. First CCM noted that for interrogatory No. 5, six jurors awarded Shephard $544,997 in damages but then for the general verdict form, signed by eight jurors, awarded Shephard $455,003. The trial court immediately noted the discrepancy and brought it up to the jury and instructed them pursuant to Civ.R. 49(B) to deliberate further to determine the correct amount. The jury returned with a general verdict form for Shephard awarding $544,997 in damages.

{¶ 244} CCM next alleged jury confusion in that, despite finding in favor of Novak on Shephard's claims, the jury did not initially complete a verdict form in favor of Novak. The jury was instructed by the trial court at CCM's request to fill out and sign a general verdict form finding for Novak and against Shephard's claims. CCM also requested the trial court instruct the jury to sign interrogatory No. 5 which did not have lines for them to sign. The parties created a signature page for interrogatory No. 5, and the court instructed the jurors to sign it, which they did. Both parties agreed to this remedy.

{¶ 245} Further, there were two jurors who did not sign interrogatory No. 1, finding age discrimination by CCM, but signed the general verdict form finding for Shephard against CCM. At CCM's request, the two jurors were brought out and questioned regarding this inconsistency. The court called juror No. 1, who stated

the jury thought everyone needed to sign the general verdict form. Juror No. 8 was also brought out and questioned as well and stated that he thought every juror needed to sign the general verdict form. Juror No. 8 would not have signed the general verdict form if he had known he did not have to. The court sent back the general verdict form to have jurors Nos. 1 and 8 to cross out their signatures, initial and date the cross out, which CCM agreed was proper.

{¶ 246} After being sent back, the jury had two additional questions. The jury was confused about whether they had to sign the general verdict form for CCM, despite finding against CCM. The second question was whether the two jurors who found against Shephard had to sign the general verdict form for CCM. The court and the parties agreed that the proper response to the jury was that signing the general verdict for CCM was unnecessary since they had already found against CCM. The general verdict form for CCM was removed from the jury's package.

{¶ 247} After this minor jury confusion, CCM moved for a new trial. The trial court denied the motion because the trial court properly resolved the jury confusion pursuant to Civ.R. 49(B). Upon our review, we find the trial court did not abuse its discretion in denying CCM's motion for a new trial based on minor immaterial jury confusion. As such, CCM's sixth assignment of error is overruled.

{¶ 248} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN A. GALLAGHER, ADMINISTRATIVE JUDGE

LISA B. FORBES, J., and
KATHLEEN ANN KEOUGH, J., CONCUR