OPINION
{¶ 1} This appeal arises from the Trumbull County Court of Common Pleas. On July 25, 2002, appellant, William P. Mamounis ("Mamounis"), was indicted on one count of money laundering and three counts of theft from an elderly person. On July 29, 2003, Mamounis was convicted of one count of theft from an elderly person, a felony in the second degree. It is from that judgment that Mamounis filed the instant appeal.
 {¶ 2} The following facts were presented by the state at trial.
 {¶ 3} Mamounis had owned a home remodeling business in the Cleveland area, Affordable Home Remodeling. Due to financial problems with the business, Mamounis was forced to close the company. Mamounis subsequently began working as an estimator for Ohio Window Design ("OWD"), a company owned by his girlfriend, Sheryl Frost. On November 10, 2000, the victim, Betty June Yeager ("Yeager"), received a telemarketing call, inquiring whether she was interested in having home remodeling performed by OWD. Yeager indicated that she may be interested. Mamounis subsequently visited Yeager's home in Girard, Ohio to provide an estimate, after which Yeager entered into a contract with OWD.
 {¶ 4} In order to finance the repairs, which totaled $16,831, Yeager mortgaged her home with First Mortgage Security for $31,300, which would cover the cost of the remodeling as well as Yeager's other outstanding debts. The monthly payment on the mortgage was $249. Yeager had no outstanding mortgage on the home prior to this time. Yeager received $642 per month in social security, which was her only source of income.
 {¶ 5} The remodeling was completed by Spring 2001. Mamounis had visited Yeager's home four times while the work was being performed to review the progress. Mamounis maintained that he, Yeager, and Frost became friends during that time, and that Yeager would frequently call the OWD office to speak with them. Mamounis stated that Yeager had begun referring to him as her son and he called her "mom." Mamounis would also drop by Yeager's home if he happened to be in the area. During his visits, Mamounis indicated to Yeager he was experiencing financial and legal problems from the failing of his Cleveland-area business. Yeager then purportedly agreed to take out a second mortgage on her house to help Mamounis out of his legal dilemma.
 {¶ 6} On August 24, 2001, Yeager signed a second mortgage, witnessed by Frost and Yvette Hunter, the closing agent for Chelsea Title Company. The second mortgage broker was Matt Huberty of Money Managers Company. The second mortgage was in the amount of $30,412 to cover the cost of Mamounis' debt to his attorney in a Cleveland lawsuit related to Mamounis' previous business. Yeager's monthly payment was $349 for the second mortgage. Yeager endorsed the check to OWD, and the check was deposited in an OWD account. A check was then drafted to Mamounis' Cleveland attorney from OWD in the amount of $21,300. The balance remained in the OWD account.
 {¶ 7} Three weeks after the closing on the second mortgage, on September 21, 2001, Yeager purportedly agreed to loan money to OWD to cover its operating expenses via her personal MasterCard. Mamounis picked up the card at Yeager's residence and took it to the OWD offices where it was "swiped" for $5,000. Mamounis returned the card to Yeager. On October 12, 2001, Mamounis again picked up the MasterCard and took it to OWD where it was again "swiped," this time for $2,000. On October 15, 2001, the credit card was again picked up from Yeager and "swiped" for an additional $2,000, which was deposited into the OWD bank account.
 {¶ 8} In October 2001, Yeager entered the hospital for surgery. During this time, Yeager's neighbor and friend, Kathy LaNeve, agreed to look after Yeager's things during her hospital stay. LaNeve testified that she had begun to realize that Yeager was having increasing memory problems and had been isolated and not particularly social. Yeager was widowed and had no contact with her son or daughter at that time. While LaNeve was at Yeager's home, she discovered the paperwork from both mortgages and the MasterCard statement. Knowing Yeager's monthly income, LaNeve became concerned that Yeager may have become overly encumbered with debt as a result of the mortgages and credit card debt.
 {¶ 9} Upon her return from the hospital, LaNeve confronted Yeager with the financial issues, at which time Yeager insisted that she owned her home free and clear and that she never authorized any MasterCard charges to OWD, Frost, or Mamounis. In response, LaNeve drafted a letter for Yeager's signature to Key Bank to contest the MasterCard charges, requesting the account be closed. LaNeve reported the unauthorized credit card use to the Girard City Police and an investigation commenced. It is unclear whether Mamounis was aware of the pending investigation. However, on December 17, 2001, shortly after the report regarding the credit card use, Mamounis and Frost picked up Yeager and took her to the office of Mamounis' attorney, Emor Snyder, where Mamounis signed a cognovit note for $32,800, promising to repay the amount of the second mortgage.
 {¶ 10} Upon learning of this transaction, LaNeve agreed to file for guardianship over Yeager. A report from Dr. P.Y. Solanski, Yeager's personal physician, confirmed LaNeve's suspicions regarding Yeager's declining mental state due to dementia.
 {¶ 11} During the course of the police investigation, Captain Frank Bigowsky attempted to interview Yeager regarding the mortgages and credit card debt but discovered that Yeager was unable to adequately provide clear and logical answers to his inquiries. Agent Cliff Evans of the Bureau of Criminal Investigation ("BCI"), also concluded that Yeager was unable to answer any questions when he interviewed her.
 {¶ 12} Despite the execution of the cognovit note by Mamounis, Yeager received two delinquency notices from Fifth Third Bank, the holder of the second mortgage. In June 2002, Senior Rights and Advocacy became involved with Yeager's case. The director of that agency at that time, Sharon Kilpatrick, was appointed by the Trumbull County Probate Court to replace LaNeve as guardian. LaNeve had been unable to continue as guardian as she was depleting her own personal income attempting to cover Yeager's financial obligations. Because of the increasing debt and expense, Kilpatrick lacked the financial resources to maintain Yeager's finances and was forced to place her in a nursing home. Chase Manhattan Mortgage, the holder of the first mortgage, foreclosed on Yeager's home, on January 30, 2003. Yeager was placed in the nursing home under protest and was enrolled on Medicaid to pay for the nursing home costs.
 {¶ 13} At the conclusion of the investigation, a grand jury secretly indicted Mamounis on July 25, 2002. He was charged with one count of money laundering, a felony of the third degree, and three counts of theft from an elderly person, felonies of the second, third, and fourth degrees. Mamounis pleaded not guilty to all charges.
 {¶ 14} The matter proceeded to a bench trial, where the court found Mamounis guilty of one count of theft from an elderly person, a felony of the second degree and acquitted Mamounis of the remaining charges. After a presentence investigation, Mamounis was sentenced to three years incarceration and ordered to pay restitution in the amount of $20,206.
 {¶ 15} Appellant filed the instant appeal, presenting three assignments of error. The first assignment of error is:
 {¶ 16} "The trial court abused its discretion by admitting the transcript of appellant's grand jury testimony."
 {¶ 17} In his first assignment of error, Mamounis contends the trial court erred and abused its discretion in admitting his grand jury testimony into evidence at trial.
 {¶ 18} The admission of relevant evidence lies within the sound discretion of the trial court.[1] A reviewing court will not reverse the trial court's admission of evidence absent an abuse of discretion.[2]
"`"Abuse of discretion" connotes more than an error of law or of judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable.'"[3]
 {¶ 19} In the instant case, the state sought to have Mamounis' grand jury testimony admitted into evidence at trial. The defense objected to its admission, stating it was not aware as to whether it was proper to allow the state to introduce the defendant's testimony. Defense counsel did not set forth a particularized objection but, rather, objected on "general principles." The state contended that Mamounis waived his rights against self-incrimination when he was subpoenaed by the grand jury and agreed to testify after being given warnings that his testimony might be used against him in a subsequent prosecution. The court admitted the transcript concluding, after a recess, that Mamounis' testimony at the grand jury proceeding was akin to him making a statement to a police officer during an investigation and statements made by him could be used against him at his trial.
 {¶ 20} As noted by the United States Supreme Court, "the very purpose of the grand jury is to elicit testimony, and it can compel answers, by use of contempt powers, to all except self-incriminating questions."[4]
In the instant case, Mamounis was warned prior to his grand jury testimony that his statements could potentially be used against him in future prosecution, pursuant to State v. Cook.[5] Although defense counsel was not present in the room while Mamounis provided testimony, he was available outside for consultation if Mamounis chose to do so.
 {¶ 21} Thus, although Mamounis focuses on his decision not to testify at trial to avoid self-incrimination, he was not compelled to answer questions at the grand jury proceeding but continued to make statements, possibly against interest, and such statements are admissible, according to the rules of evidence. Specifically, Evid.R. 801(D)(2) provides that admissions made by a party are not hearsay under the rules when:
 {¶ 22} "The statement is offered against a party and is (a) his own statement, in either his individual or representative capacity, or (b) a statement of which he has manifested his adoption or belief in its truth[.]"
 {¶ 23} During the course of his grand jury testimony, Mamounis had the opportunity to tell his side of the story and continued to respond to the jurors' questions and develop his story as he saw it. He was not compelled to continue to testify, and yet elected to make statements regarding his involvement with Yeager, many of which were self-serving.
 {¶ 24} We conclude the trial court did not err in admitting Mamounis' statements made at the grand jury proceedings as they are admissible under Evid.R. 801(D)(2) as an "Admission by party-opponent."
 {¶ 25} The transcript admitted at trial also included statements made by grand jurors, beyond the questions asked of Mamounis. In some instances a juror would provide commentary regarding Mamounis' "track record" for his behavior. In particular, the following statement was made by a juror during Mamounis' testimony:
 {¶ 26} "What all makes this look bad is your actions in Cleveland that shows that you're not going to be liable for debt. And then you come here and you borrow on a personal basis that amount of money from a senior citizen. I mean, as a business person — I'm not even a business person, but I would know to go to an attorney and draw up an agreement before I borrowed that much money off of somebody, especially a senior citizen."
 {¶ 27} This statement and any other statements made by jurors at the grand jury proceeding go more toward deliberation by the jury and are not questions asked of a witness. They are highly prejudicial in nature and have not been tested by cross-examination. If the transcript of this grand jury proceeding was admitted in a jury trial without redacting the irrelevant statements of the unsworn jurors, reversible error would result.
 {¶ 28} In a bench trial, the trial judge is presumed to possess the ability to remain objective when examining the evidence, determine the credibility of witnesses, and "know the applicable law and apply it accordingly."[6]
 {¶ 29} Thus, in the instant case, particularly in light of the overwhelming direct and circumstantial evidence presented by the state as noted below, the admission of the jurors' comments along with Mamounis' testimony is harmless error. Other evidence, in the form of witness testimony and documentary materials presented by the state, support the conviction.
 {¶ 30} Mamounis' first assignment of error is without merit.
 {¶ 31} The second assignment of error is:
 {¶ 32} "The appellant's conviction for theft from an elderly person is not supported by sufficient evidence."
 {¶ 33} The thrust of Mamounis' argument in his second assignment of error is that the state failed to prove the necessary element of "deception," an element of the offense of theft from an elderly person and, therefore, the evidence was legally insufficient to support the conviction.
 {¶ 34} Sufficiency challenges whether the state presented evidence on each element of an offense in order to permit the matter to go to the trier of fact.[7] When determining whether there is sufficient evidence presented to sustain a conviction, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."[8]
 {¶ 35} Theft from an elderly person is codified under R.C. 2913.02, which reads, in pertinent part:
 {¶ 36} "(A) No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services in any of the following ways:
 {¶ 37} "* * *
 {¶ 38} "(3) By deception;
 {¶ 39} "(B)(1) Whoever violates this section is guilty of theft.
 {¶ 40} "* * *
 {¶ 41} "(3) Except as otherwise provided in division (B)(4), (5), or (6) of this section, if the victim of the offense is an elderly person or disabled adult, a violation of this section is theft from an elderly person or disabled adult[.]"
 {¶ 42} Mamounis contends the state failed to prove the element of "deception." "Deception" is defined in R.C. 2913.01(A) as:
 {¶ 43} "`Deception' means knowingly deceiving another or causing another to be deceived by any false or misleading representation, by withholding information, by preventing another from acquiring information, or by any other conduct, act, or omission that creates, confirms, or perpetuates a false impression in another, including a false impression as to law, value, state of mind, or other objective or subjective fact."
 {¶ 44} In its judgment entry, the trial court noted that Mamounis obtained monies from Yeager through deception:
 {¶ 45} "It is apparent from the manner in which Defendant participated in the second mortgage application that he was aware of the total amount of Mrs. Yeager's social security income. Defendant was aware that the information on the second mortgage application was incorrect in two places. Her income is listed as $1,375.00 per month rather than $642.00 and the appraisal was listed at $75,000.00 when the first loan application carried the amount of $66,000.00. The actual appraisal in the loan package was in the amount of $64,000.00."
 {¶ 46} Thus, in convicting Mamounis on count two, theft from an elderly person, the court concluded: "[t]his Court concludes that Defendant took advantage of Mrs. Yeager and deceived her by the promise of agreeing to repay the second mortgage. From the evidence presented and his own testimony before the Grand Jury, it is not credible to believe that he believed it would be possible for him to repay the mortgage on Mrs. Yeager's real estate."
 {¶ 47} As the trial court convicted Mamounis on count two, theft from an elderly person, a second-degree felony, it concluded that the evidence presented demonstrated that Mamounis deceived Yeager into obtaining a second mortgage on her property to cover his legal fees.
 {¶ 48} The second mortgage was obtained on August 24, 2001. At that time, Mamounis was aware of Yeager's monthly social security income, totaling $642 per month. He was also aware that, only eight months previously, Yeager had taken out the initial mortgage on her home to finance the home remodeling. That initial mortgage payment was $249 per month, an amount representing a large amount of Yeager's monthly income. A second mortgage payment would leave Yeager with little, if any, remaining income with which she could meet her other basic expenses.
 {¶ 49} Mamounis testified to the grand jury that he intended to repay the second mortgage himself. However, he took means to formalize that intention only after the police investigation commenced, when he and Frost picked up Yeager and took her to his attorney's office to execute a cognovit note. In reality, Yeager began receiving delinquent notices on the second mortgage as Mamounis was not paying it, leaving Yeager in dire financial straits. Mamounis' deception is further revealed through the testimony of Matt Huberty, the mortgage broker on the second mortgage. Huberty testified that he was given inflated figures for Yeager's monthly income and the appraised value of the home, both of which the trial court noted in its judgment entry.
 {¶ 50} The record also demonstrates that Yeager's personal physician recognized her mental state was deteriorating as a result of dementia. Moreover, Yeager could not participate in the investigation of the charges against Mamounis due to her inability to respond to any questions presented to her just a short time after her last "loan" to Mamounis — evidence of Yeager's deteriorating mental capacity.
 {¶ 51} Therefore, after viewing the evidence in a light most favorable to the prosecution, we conclude the trial court could have found the essential elements of the crime proven beyond a reasonable doubt. Thus, Mamounis' conviction of theft from an elderly person is supported by sufficient evidence.
 {¶ 52} Mamounis' second assignment of error is without merit.
 {¶ 53} The third assignment of error is:
 {¶ 54} "The appellant's conviction is against the manifest weight of the evidence."
 {¶ 55} In determining whether a verdict is against the manifest weight of the evidence, "`"the court reviewing the entire record, weighs theevidence and all reasonable inferences, considers the credibility of the witnesses and determines whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered."'"[9] Appellate courts engage in a limited weighing of the evidence introduced at trial.[10]
 {¶ 56} In his third assignment of error, Mamounis contends his conviction was a "compromise verdict" by the trial court as it found the circumstances "too questionable to fully acquit" Mamounis on all charges. We disagree.
 {¶ 57} At trial, the state presented the testimony of several witnesses, each of whom, coupled with the documentary evidence, provided circumstantial evidence that Mamounis deceived Yeager, a seventy-two-year-old woman, living on a small monthly income, into "loaning" him money to cover his legal debts, with no intention of repaying her and with little regard as to her well-being.
 {¶ 58} LaNeve testified that she had noticed ongoing mental deterioration in the form of dementia and memory loss over the course of the past few years. She also testified that she confronted Yeager about her finances after Yeager returned from her hospital stay, and Yeager adamantly insisted that she owned her house "free and clear."
 {¶ 59} There was also testimony from Captain Bigowsky of the Girard City Police Department and Cliff Evans from BCI that Yeager was unable to participate in the investigation due to her mental deterioration. Bigowsky interviewed Yeager just one week after the police were contacted. He testified that at that time Yeager appeared "confused," had "difficulty in answering the questions," and gave varying answers to the same question. He testified he only interviewed her twice during the entire investigation as "[i]t didn't appear she was stable enough to give a direct answer."
 {¶ 60} Cliff Evans from BCI interviewed Yeager only once and testified that Yeager's answers were "confusing" and that she had difficulty remembering any details regarding the loans or how they were obtained. He testified that she had scant memories of signing documents but no memory of the loan amounts or conversations about obtaining any loans.
 {¶ 61} There was also testimony from Matt Huberty, the mortgage broker for the second mortgage loan, who testified that the elevated figures for both Yeager's monthly income and the appraised value on her home were given to him from either Mamounis or Frost.
 {¶ 62} Admitted into evidence was the cognovit note obtained by Mamounis from his attorney after the police investigation commenced wherein he promised to repay the "loan." Also admitted were the delinquent notices sent to Yeager regarding the mortgage, evidence that Mamounis had not paid the loan despite the cognovit note.
 {¶ 63} We conclude, weighing the evidence included within the record before us, that the court, as trier of fact, did not lose its way creating a manifest miscarriage of justice. The overwhelming evidence, though circumstantial, supports Mamounis' conviction of theft from an elderly person.
 {¶ 64} Mamounis' third assignment of error is without merit.
 {¶ 65} Therefore, based on the foregoing, Mamounis' assignments of error are without merit and the judgment of the Trumbull County Court of Common Pleas is affirmed.
Ford, P.J., Grendell, J., concur.
[1] State v. Kinley (1995), 72 Ohio St.3d 491, 497.
[2] Peters v. Ohio State Lottery Comm. (1992), 63 Ohio St.3d 296, 299.
[3] (Citations omitted.) Huffman v. Hair Surgeon, Inc. (1985),19 Ohio St.3d 83, 87.
[4] (Emphasis added.) United States v. Washington (1977), 431 U.S. 181,184, fn.2.
[5] State v. Cook (1983), 11 Ohio App.3d 237, 241 (The court held that the putative defendant-witness at a grand jury proceeding must be told he has a constitutional privilege to refuse to answer incriminating questions.)
[6] State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus; State v. Turner, 11th Dist. No. 2004-A-0005, 2004-Ohio-5632, at ¶ 15, citing State v. Eley (1996), 77 Ohio St.3d 174, 180-181.
[7] State v. Jenks, 61 Ohio St.3d 259, paragraph two of the syllabus.
[8] Id.
[9] (Emphasis in original and citations omitted.) State v. Schlee
(Dec. 23, 1994), 11th Dist. No. 93-L-082, 1994 Ohio App. LEXIS 5862, at *14-15.
[10] State v. Thompkins (1997), 78 Ohio St.3d 380, 387-388.