[Cite as *In re Q.M.B.*, 2026-Ohio-1975.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

IN RE Q.M.B.                     :
                                 :          No. 115747
A Minor Child                    :
                                 :
[Appeal by L.H., Mother]         :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** May 28, 2026

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. AD25905454

---

### *Appearances:*

Judith M. Kowalski, *for appellant.*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Joseph C. Young, Assistant Prosecuting Attorney, *for appellee* CCDCFS.


TIMOTHY W. CLARY, J.:

{¶ 1} Appellant L.H. ("Mother") appeals from the juvenile court's order that placed her minor child, Q.M.B. (d.o.b. 12/31/2024), in the temporary custody of the Cuyahoga County Division of Children and Family Services ("the agency" or "CCDCFS"). For the following reasons, we affirm the lower court's decision.

## I. Factual and Procedural History

{¶ 2} Prior to the proceedings related to Q.M.B., the agency filed a complaint on behalf of Mother's older child, W.B. (d.o.b. 11/17/2008), who was adjudicated neglected on September 20, 2023, and placed in the CCDCFS's planned permanent living arrangement ("PPLA") on December 5, 2024. Cuyahoga J.C. No. AD23906812.

{¶ 3} Mother gave birth to Q.M.B. on December 31, 2024; E.B. is the child's Father. On January 24, 2025, the agency filed a complaint alleging that Q.M.B. was neglected and dependent and seeking temporary custody of the child. Cuyahoga J.C. No. AD25900769. On February 10, 2025, the juvenile court committed Q.M.B. to the predispositional emergency temporary custody of CCDCFS and ordered Mother to disclose the location of the child. Mother refused to disclose Q.M.B.'s whereabouts and failed to appear at a scheduled hearing on March 4, 2025; accordingly, the court issued a warrant for Mother. After the U.S. Marshals became involved, Mother's mother, M.H., relinquished custody of Q.M.B. to the agency on April 14, 2025. CCDCFS voluntarily dismissed the complaint because the matter could not be resolved within the statutory-required timeframe.

{¶ 4} On May 29, 2025, CCDCFS filed another complaint for neglect, dependency, and temporary custody to the agency and a motion for predispositional temporary custody. Cuyahoga J.C. No. AD25905454. The following day, the magistrate held a hearing; heard testimony and the guardian ad litem's ("GAL") recommendation; and granted the agency's motion for predispositional temporary

custody. On June 12, 2025, Mother filed a motion to set aside the magistrate's order arguing that it was in Q.M.B.'s best interest to be returned to Mother's care and custody. Following an independent review of the court record, the pending motion, and the recording of the May 30, 2025 hearing, the juvenile court denied Mother's motion. As of June 27, 2025, the agency had placed Q.M.B. in foster care.

{¶ 5} The magistrate conducted a bifurcated trial on August 19, 2025, addressing Q.M.B.'s adjudication and disposition. Present at trial were Mother and her counsel; E.B.'s counsel and GAL; Q.M.B.'s GAL; counsel for the agency; and agency case workers LaGina White ("White") and Elaina Sadler ("Sadler").

## A. Adjudicatory Hearing

{¶ 6} During the adjudicatory phase of the trial, the juvenile court heard testimony from Officer Andrew Hlywa ("Officer Hlywa"), White, and Sadler.

## 1. Officer Hlywa

{¶ 7} Officer Hlywa, a patrolman with the Garfield Heights Police Department, testified that he responded to a disturbance on February 11, 2025, between Mother and her mother, M.H. ("February 2025 incident"). Upon entering M.H.'s apartment building, Officer Hlywa heard Mother, who was standing at the top of the second-floor stairway holding Q.M.B. in a car seat, state, "I'm going to throw this b**ch." Tr. 11. M.H. responded that Mother was "going to hurt the baby." Tr. 13. Officer Hlywa observed Mother and M.H. in "a disturbed state," and he attempted to separate the two women. *Id.* Mother attempted to evade the police, but she was stopped. Officer Hlywa gained possession of Q.M.B., handed her to

M.H., and observed a scratch and bump on M.H.'s face that were allegedly caused when Mother struck M.H.

{¶ 8} Officer Hlywa testified that Mother was uncooperative and refused to walk independently to his cruiser, continuously spat at the officers while she was seated in the back seat of the cruiser, and refused to provide her name or address when she was being booked at the police station. Mother was arrested on charges of domestic violence, resisting arrest, and obstructing official business. Officers placed Mother in a "detox cell" because of her uncooperative behavior, and she attempted to strangle herself three separate times while in the cell. The agency played Officer Hlywa's body-camera footage depicting the above-described events.

## 2. LaGina White

{¶ 9} White testified consistently with the above-stated facts and provided the following testimony.

{¶ 10} White stated that in April 2024, she was assigned to Mother's case relating to her son, W.B., and continued as Mother's case worker when Q.M.B. was born. White last met with Mother in June 2024.

{¶ 11} White stated that W.B. was adjudicated neglected because the agency had concerns about pending charges for domestic violence and child endangering — with W.B. listed as the victim — and Mother's decision-making, parenting skills, and substance abuse. White further testified that prior to W.B.'s disposition, Mother was unwilling to acknowledge the agency's concerns or engage in case-plan services and, therefore, the child was placed in a PPLA. In December 2024, Q.M.B. was added to

Mother's case plan. White testified that after viewing the body-camera footage of the February 11, 2025 incident, she had continued concerns about Mother's mental health, parenting skills, and decision making.

{¶ 12} White also testified that Mother pled guilty to assault in February 2017; had pending moving-violation citations stemming from a March 2019 incident; and had pending criminal charges for OVI, driving with a suspended driver's license, and failure to control that were issued in 2022. White stated that the OVI charges raised concerns about substance abuse. According to White, the agency was also concerned about E.B. — the child's father — and his ability to provide care because there were prior and pending domestic-violence and other criminal charges against him.[1]

### 3. Elaina Sadler

{¶ 13} The agency assigned Sadler to Q.M.B.'s case in May and June 2025, when White took a leave of absence. Sadler had five interactions with Mother, four of which involved supervised visitations between Mother and Q.M.B. Per Sadler, Mother's interactions during the supervised visitations were positive, caring, and appropriate, and Mother did not appear angry or under the influence of drugs or alcohol. However, Sadler had concerns about Mother based upon her review of the body-camera footage from the February 2025 incident, including Mother's statement that she was going to throw the baby off the balcony. Sadler never

---

[1] According to the CCDCFS, police reports documented allegations of assault by E.B. against Mother on October 13, 2024, and allegations of domestic violence on October 15, 2024, that resulted in Mother's hospitalization.

discussed those concerns with Mother. Sadler attempted to discuss with Mother the domestic-violence incidents between Mother and E.B., but Mother was not forthcoming. Sadler stated that E.B. attended some of the supervised visits and she noticed that he had a difficult time soothing the child and he became frustrated.

{¶ 14} Based upon the trial testimony of Officer Hylwa, White, and Sadler, the magistrate found the allegations of the amended complaint were proven by clear and convincing evidence and adjudicated Q.M.B. neglected and dependent.

## B. Dispositional Hearing

{¶ 15} The court incorporated the evidence presented during the adjudicatory hearing for the dispositional phase of the trial and heard additional testimony from Sadler, White, and the child's GAL.

### 1. Sadler

{¶ 16} Sadler testified that Mother thought the agency's concerns about her care of Q.M.B. lacked merit. Sadler stated that she observed Mother's home and found the home appropriate with all the necessary provisions for Q.M.B. and Mother acted appropriately during the supervised visits. During Sadler's last meeting with Mother, Mother agreed to consider addressing the services detailed in her case plan; E.B. was unwilling to engage in case-plan services.

### 2. White

{¶ 17} White further testified that from January 2025 through April 2025, Mother would not communicate with her and when the agency received the child in April 2025, Mother was unwilling to engage in case-plan services. Mother

subsequently contacted one of the resources provided by Sadler and underwent mental -health and substance-abuse assessments although the agency was unable to provide any information regarding those assessments because Mother failed to execute the required release of information.

{¶ 18} The mental-health assessment recommended Mother undergo counseling; the substance-abuse assessment did not result in any recommendations for care or treatment.  At the time of the hearing, Mother had not completed any services supposedly because she lacked medical insurance.  White stated that she had continued concerns about Mother's mental health based upon her prior interactions with Mother and the February 2025 incident.

{¶ 19} White testified that she inspected and found Mother's home appropriate, with all the necessary provisions, and Mother and child's interactions at weekly supervised visits were "very loving, very engaged." Tr. 95.  Conversely, at the visits, E.B. was unable to calm the child.  White further stated that E.B.'s case-plan services included parenting and domestic-violence classes but E.B. was unwilling to engage in the services and had indicated that he was not interested in providing for the child's basic needs.

{¶ 20} White testified that reunification was premature before Mother engaged in and completed case-plan services and exhibited behavioral changes.

**3. The Child's GAL**

{¶ 21} Q.M.B.'s GAL recommended temporary custody to the agency.  He noted concerns about Mother's history of noncompliance, the February 11, 2025

incident, and past and pending convictions, and he stated "that some services and some evaluations need to be ordered to ensure the child's safety." Tr. 101.

{¶ 22} Based upon the trial testimony and the GAL's recommendation, the magistrate found that temporary custody to CCDCFS was in the child's best interest. The magistrate terminated the court's prior emergency predispositional temporary custody order and committed Q.M.B. to the temporary custody of the agency.

## C. Magistrate and Juvenile Court Findings

{¶ 23} On August 20, 2025, the magistrate issued his decision and findings of fact. On September 3, 2025, Mother filed objections to the magistrate's decision disputing the adjudication findings and the commitment of Q.M.B. to the agency's temporary custody. On September 17, 2025, the agency filed a brief in support of the magistrate's decision, and on September 22, 2025, Mother filed the trial transcripts. Upon an independent review of the court file, the magistrate's decision, Mother's objections, the agency's brief in support, and the transcripts, the court found Mother's objections were not well-taken. On October 1, 2025, the court issued a judgment entry and findings of fact that adjudicated Q.M.B. neglected and dependent and committed the child to the temporary custody of CCDCFS, and it is from this judgment entry that Mother has filed an appeal.

{¶ 24} On January 21, 2026, Mother filed a timely appeal, presenting three assignments of error for our review:

> Assignment of Error I: The trial court erred in finding that clear and convincing evidence supported an adjudication of neglect and dependency.

Assignment of Error II: The trial court erred finding that a preponderance of the evidence supported a disposition of temporary custody to CCDCFS.

Assignment of Error III: The trial court erred to the prejudice of the Mother by permitting the State to play the video of Mother's arrest, even though the State had already elicited testimony from the arresting officer, as said evidence was unnecessarily prejudicial to the Mother, and not directly relevant as to the adjudication of whether the child was an abused, neglected or dependent child.

## II. Legal Analysis

## A. Adjudication Hearing

{¶ 25} In her first assignment of error, Mother challenges the juvenile adjudication of Q.M.B. as neglected and dependent. Specifically, Mother contends that the magistrate based its determination of neglect on a single event — the February 2025 incident — and there was no evidence to support its determination of dependency.

{¶ 26} Pursuant to R.C. 2151.35(A)(1) and Juv.R. 29(E)(4), the juvenile court was required to determine whether CCDCFS presented clear and convincing evidence to prove that the child should be adjudicated abused and neglected. Clear and convincing evidence has been defined as "that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *In re K.H.*, 2008-Ohio-4825, ¶ 42, quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus. "'Where the proof

required must be clear and convincing, a reviewing court will examine the record to determine whether the trier of fact[ ] had sufficient evidence before it to satisfy the requisite degree of proof.'" *In re Z.C.*, 2023-Ohio-4703, ¶ 8, quoting *State v. Schiebel*, 55 Ohio St.3d 71, 74 (1990), citing *Ford v. Osborne*, 45 Ohio St. 1 (1887), paragraph two of the syllabus. Additionally, "the determination whether a child is dependent, neglected, or abused must be made based on evidence of facts as they existed at the time alleged in the complaint." *In re R.L.*, 2017-Ohio-4271, ¶ 13 (9th Dist.).

{¶ 27} When reviewing a juvenile court's decision under a manifest-weight-of-the-challenge standard,

> the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered.

*In re Z.C.*, 2023-Ohio-4703, ¶ 14, citing *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20.

{¶ 28} With these standards in mind and based on our review of the record, we find that the juvenile court's adjudication of Q.M.B. as neglected and dependent was supported by sufficient evidence and was not against the manifest weight of the evidence.

{¶ 29} The juvenile court found Q.M.B. neglected pursuant to R.C. 2151.03(A)(2) and (A)(3). A neglected child is defined, in relevant part, as a child who "lacks adequate parental care because of the faults or habits of the child's parents, guardian, or custodian." R.C. 2151.03(A)(2). "Adequate parental care"

means "the provision by a child's parent or parents . . . of adequate food, clothing, and shelter to ensure the child's health and physical safety and the provision by a child's parent or parents of specialized services warranted by the child's physical or mental needs." R.C. 2151.011(B)(1). R.C. 2151.03(A)(2) "requires some showing that parents . . . [are] at fault before a finding of a lack of proper (or adequate) care can be made." *In re Riddle*, 1997-Ohio-391, ¶ 18. Further, R.C. 2151.03(A)(3) provides that a child is neglected if the child's "parents . . . refuse[ ] to provide proper or necessary subsistence, education, medical or surgical care or treatment, or other care necessary for the child's health, morals or well[-]being." R.C. 2151.04(C) defines a dependent child as one "[w]hose condition or environment is such as to warrant the state, in the interests of the child, in assuming the child's guardianship."

{¶ 30} The record shows that the agency was concerned about Mother's mental health, parenting skills, lack of parenting knowledge, and decision-making skills. Despite the juvenile court's February 10, 2025 order that granted temporary emergency custody of Q.M.B. to the agency, Mother refused to relinquish custody of her child until two months later when a warrant had been issued and the U.S. Marshals were involved. On February 11, 2025, Mother threatened to harm Q.M.B.; allegedly committed domestic violence against her mother, M.H.; acted belligerently and uncooperatively with police officers; and attempted to harm herself while in jail. Mother was unwilling to participate in Q.M.B.'s case plan until approximately one month prior to the adjudication hearing. And even then, Mother unilaterally obtained assessments, thereby preventing the agency from providing relevant

information to the assessor. Mother also refused to participate in case-plan services for W.B. that resulted in his placement in a PPLA. We note the case workers' testimony that Mother's home was appropriate with the necessary provisions for Q.M.B.

{¶ 31} The agency proved by clear and convincing evidence that Mother did not provide the requisite care necessary for the child's well-being thereby supporting a finding that Q.M.B. was neglected. The trial testimony provided sufficient clear and convincing evidence demonstrating that the child's environment — where Mother threatened to harm the child and herself and refused to relinquish custody to the agency despite a court order — warranted classifying Q.M.B. as dependent. Additionally, the juvenile court's adjudication findings were not against the manifest weight of the evidence.

{¶ 32} Mother's first assignment of error is overruled.

## B. Temporary Custody to the Agency

{¶ 33} In her second assigned error, Mother asserts that that the juvenile court abused its discretion when it placed Q.M.B. in the temporary custody of the agency. Specifically, Mother argues that her appropriate care of Q.M.B. and her agreement to participate in case-plan services precluded the juvenile court from finding the child should be placed in the agency's temporary custody. The testimony indicated that Mother loves Q.M.B. but that is not the test for determining whether it was in the child's best interest to award temporary custody to the agency.

{¶ 34} "Following an adjudicatory hearing, if the juvenile court finds clear and convincing evidence that the child is abused, neglected, or dependent, the court must hold a separate dispositional hearing before issuing a disposition order." *In re J.S.*, 2022-Ohio-1679, ¶ 12 (8th Dist.), citing R.C. 2151.35(A)(1) and 2151.53. The juvenile court then "is authorized to order a disposition for the child, which includes (1) placing the child in protective supervision; (2) committing the child to the temporary custody of the agency; (3) awarding legal custody of the child to either parent or another person; or (4) committing the child to the permanent custody of the agency." *In re K.E.*, 2022-Ohio-3333, ¶ 15 (8th Dist.), citing R.C. 2151.353(A). In choosing between these dispositions, the court's "primary concern remains the best interest of the child." *Id.* at ¶ 17, citing *In re Ka.C.*, 2015-Ohio-1158, ¶ 19 (8th Dist.).

{¶ 35} "An award of temporary custody to a public or private children's services agency is substantially different from an award of permanent custody, where parental rights are terminated." *Ka.C.* at ¶ 20. Pursuant to an award of temporary custody, "the parent only loses temporary custody of a child and retains residual parental rights, privileges, and responsibilities." *Id.* Because parents may regain custody of their child, "'the juvenile court employs the less restrictive "preponderance of the evidence" standard in temporary custody cases as opposed to the "clear and convincing" standard of evidence employed at the dispositional stage in permanent custody cases.'" *Id.*, quoting *In re M.J.M.*, 2010-Ohio-1674, ¶ 9 (8th Dist.).

{¶ 36} Here, Mother was unwilling to relinquish custody of Q.M.B. to the agency despite a court order to do so. Mother was unwilling to comply with the case-plan services until approximately one month before the dispositional hearing. Mother obtained a mental-health and substance-abuse assessment but because she did so unilaterally, the agency was unable to provide collateral information for the assessor to consider. E.B., the child's father, refused to participate with case-plan services. The child's GAL recommended temporary custody based upon concerns regarding Mother's behavior — presumably the February 11, 2025 incident where she threatened to harm the child and attempted to harm herself — and her history of noncompliance with the agency as well as her past and pending criminal convictions.

{¶ 37} Based upon the testimony at the dispositional hearing, we find that the juvenile court's decision awarding the agency temporary custody of Q.M.B. was in the child's best interest and was supported by the preponderance of the evidence.

{¶ 38} Mother's second assignment of error is overruled.

## C. Body-Camera Footage

{¶ 39} In her third assignment of error, Mother contends that the juvenile court erred when it allowed the agency to introduce Office Hlywa's body-camera footage. Specifically, Mother contends that because Office Hlywa testified about Mother's arrest the subsequent presentation of his body-camera footage was unnecessarily prejudicial to Mother and not directly relevant to the adjudication of Q.M.B.

{¶ 40} A trial court has broad discretion when determining admissibility of evidence. *McGuinea v. Ganley Nissan, Inc.*, 2005-Ohio-6239, ¶ 13 (8th Dist.). A reviewing court subjects a question on the admissibility of evidence to an abuse-of-discretion standard. *Shephard v. CrossCountry Mtge., Inc.*, 2025-Ohio-1929, ¶ 217 (8th Dist.).

{¶ 41} Pursuant to Evid.R. 402, relevant evidence is generally admissible although even relevant evidence may be inadmissible "if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Evid.R. 403(A). "In order for the evidence to [be] deemed inadmissible, its probative value must be minimal and its prejudicial value great." *State v. Powell*, 2023-Ohio-2770, ¶ 36 (8th Dist.), quoting *State v. Harding*, 2006-Ohio-481, ¶ 22 (2d Dist. ), citing *State v. Morales*, 32 Ohio St.3d 252, 257-258 (1987). The Ohio Supreme Court has stated that "relevant evidence, challenged as being outweighed by its prejudicial effects, should be viewed in a light most favorable to the proponent of the evidence, maximizing its probative value and minimizing any prejudicial effect to one opposing admission." *State v. Frazier*, 1995-Ohio-235, ¶ 65.

{¶ 42} Unfairly prejudicial evidence has been described as evidence that arouses a "jury's emotional sympathies, evokes a sense of horror, or appeals to an instinct to punish" and "[u]sually . . . appeals to the jury's emotions rather than intellect." *Oberlin v. Akron Gen. Med. Ctr.*, 2001-Ohio-248, ¶ 172, quoting *Weissenberger's Ohio Evidence*, § 403.3, at 85-87 (2000). "In a bench trial, the trial

judge is presumed to possess the ability to remain objective when examining the evidence." *State v. Mamounis*, 2005-Ohio-2654, ¶ 28 (11th Dist.); *see In re A.M.*, 2023-Ohio-671, ¶ 51 (11th Dist.).

{¶ 43} Mother has not presented any reasoning why presentation of the body-camera footage was "highly prejudicial." We do not find compelling Mother's argument that viewing the footage was prejudicial because her criminal case — that stemmed from the February 2025 incident when the body-camera footage was recorded — was pending at the time of the disposition hearing. We presume that the magistrate and judge who reviewed the body-camera footage could distinguish the legitimate probative effect of the body-camera footage.

{¶ 44} Mother's third assignment of error is overruled.

{¶ 45} Judgment affirmed.

It is ordered that parties share the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27

of the Rules of Appellate Procedure.

_____
TIMOTHY W. CLARY, JUDGE

MARY J. BOYLE, P.J., and
SEAN C. GALLAGHER, J., CONCUR